## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: Middle District of Florida | |
|---|---|---|
| Name:<br>Khadafy Kareem Mullens | | Docket or Case No.: |
| Place of Confinement:<br>**Union Correctional Institution** | Prisoner No.: R17884 | |
| Petitioner,<br>Khadafy Kareem Mullens<br><br>v.<br><br>Respondents,<br>Ricky D. Dixon,<br>Sec. Dept. of Corrections, Florida<br><br>&<br>Ashley B. Moody<br>Attorney General, Florida. | | |

## PETITION

1.      (a) Name and location of court that entered the judgment of conviction you are challenging: The Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida.

        (b) Criminal docket or case number: 2008-CF-18029

2.       (a) Date of the judgment of conviction: April 29, 2013

        (b) Date of sentencing: August 23, 2013

3.      Length of sentence: Death on Counts 1 and 2 and Life on Count 3.

1

4.    In this case, were you convicted on more than one count or of more than one crime? Yes.

5.    Identify all crimes of which you were convicted and sentenced in this case: Two counts of first-degree murder and one count of attempted first degree murder.

6.    (a) What was your plea? Guilty.

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? Pleaded guilty as charged to all counts.

(c) If you went to trial, what kind of trial did you have? Judge only on penalty/sentencing phase.

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing? No.

8. Did you appeal from the judgment of conviction? Yes.

9. If you did appeal, answer the following:

(a) Name of court:  The Supreme Court of Florida.

(b) Docket or case number: SC13-1824

(c) Result: The Florida Supreme Court affirmed the conviction and death sentence.  The Court remanded for "entry of a written order of competency, nunc pro tunc to September 16, 2011."

(d) Date of result: June 16, 2016

(e) Citation to the case: *Mullens v. State*, 197 So. 3d 16 (Fla. 2016)

(f) Grounds raised:

1)  The trial court erred in admitting video recordings from the surveillance cameras, and photographs taken from them, because the State failed to properly authenticate the recordings and photographs;

2) The circumstantial evidence is insufficient to support the "avoid arrest" aggravator because the evidence does not contradict the theory that Appellant shot the victims impulsively in a rage or panic after he saw the store owner on the telephone;

3) Appellant's death sentence must be reversed because the court committed a *Campbell* violation by failing to consider Appellant's nonstatutory mental, background, and character mitigation, and because the court made factual errors that caused it to reject or improperly weight the mitigation is did consider;

4) Appellant's death sentences are disproportionate because of the substantial amount of statutory mental mitigation and other nonstatutory mitigation;

5) Whether the case has to be remanded to the trial court for a written order of competency to stand trial; and

6) Because *Hurst* rendered Florida's death penalty scheme unconstitutional, Section 775.082(2), Florida Statutes, applies and Appellant must be resentenced to life.

(g) Did you seek further review by a higher state court? N/A. The Florida Supreme Court is the highest state court in Florida and had jurisdiction over the direct appeal of the conviction and death sentence.

(h) Did you file a petition for certiorari in the United States Supreme Court?

Yes.

If yes, answer the following:

(1) Docket or case number: No. 16-6773

(2) Result: Denied

(3) Date of result: Decision Date: June 16, 2016; Rehearing Denied:

August 9, 2016

(4) Citation to the case: *Mullens v. Florida*, 137 S. Ct. 672 (Mem)

(2017).

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court? Yes.

11. If your answer to Question 10 was "Yes," give the following information:

(a)    (1) Name of court: State Circuit Court, Sixth Circuit, in and for Pinellas County, Florida
(2) Docket or case number: 2008-CF-18029
(3) Date of filing: December 18, 2017; Amended May 15, 2018
(4) Nature of the proceeding: Amended Motion to Vacate Judgment and Sentence.

(5) Grounds raised:

**Claim 1**:  Defense counsel rendered ineffective assistance of counsel by failing to object to irrelevant and prejudicial still photographs that depicted the victims at the moment of death.

**Claim 2**:  Mr. Mullens' guilty plea and jury waiver were not made knowingly, voluntarily and intelligently due to trial counsels' prejudicial ineffective assistance of counsel. But for counsels' errors, Mr. Mullens would have insisted on a guilt phase trial and would not have waived his right to a jury trial.

**Claim 3**:  Defense counsel rendered prejudicial ineffective assistance during the penalty phase mitigation presentation, violating rights secured to Mr. Mullens under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and corresponding provisions of the Florida Constitution.

a. Ineffective assistance of counsel for failure to introduce a cohesive mitigation narrative and investigate and present evidence of diminished capacity, post-traumatic stress disorder, childhood sexual and physical abuse, and assaults in prison.

b. Ineffective assistance of counsel for failure to ensure an adequate and competent mental health evaluation, neuropsychological testing, and brain scans, including the investigation and presentation of brain damage and dysfunction.

c. Ineffective assistance of counsel for mismanagement of an incompetent expert, Dr. Scott Machlus, who failed to identify organic brain damage and the need for neurological testing, failed to administer psychological tests according to professional standards, made several errors in scoring, performed repeated personality testing to diagnose anti-social personality disorder, and failed to diagnose post-traumatic stress disorder.

d. The cumulative effect of counsel's grave errors deprived Mr. Mullens of a fair sentencing proceeding.

**Claim 4**:  Mr. Mullens' death sentence violates Florida statute § 921.137.1, the Fifth, Eighth and Fourteenth amendments to the United States Constitution, corresponding provisions of the Florida Constitution and Florida's constitutional prohibition against cruel and unusual punishment.

   a.  Mr. **Mullens** has significantly sub-average intellectual functioning (IQ).

   b.  Even without the results of an ongoing post-conviction investigation, Mr. Mullens has demonstrated deficits in adaptive functioning that may qualify him for an exemption due to intellectual disability.

   c.  Both the clear and convincing standard and the age of onset requirements of Florida Statute § 921.137 violate the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Florida Constitution.

**Claim 5**: Cumulatively, the combination of procedural and substantive errors during deprived Mr. Mullens of the fundamentally fair trial guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and corresponding rights under the Florida Constitution.

CLAIMS FOR WHICH AN EVIDENTIARY HEARING WAS NOT REQUIRED

**Claim 6**:  Mr. Mullens' death sentences should be vacated as he was sentenced under an unconstitutional statute and sentencing scheme. *Hurst v. Florida* provides relief to Mr. Mullens despite the fact he waived a jury for his penalty phase.

**Claim 7**:  Florida's capital sentencing statute is unconstitutional for failing to prevent the arbitrary and capricious imposition of the death penalty and for violating the guarantee against cruel and unusual punishment in violation of *Furman v. Georgia* and the Fifth, Sixth, Eighth and Fourteenth Amendments of the U.S. Constitution.

**Claim 8**:  Fla. Stat. 945.10 prohibits Mr. Mullens from knowing the identity of the execution team members, denying him his constitutional rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and corresponding Florida Constitution provisions

**Claim 9**: Mr. Mullens' Eighth Amendment right against cruel and unusual punishment will be violated as Mr. Mullens may be incompetent at time of execution.

(6) Did you receive a hearing where evidence was given on your petition, application, or motion? Yes, on some claims; other claims were denied, or an evidentiary hearing was not sought because the claims were purely legal.

(7) Result: Death sentence vacated; motion granted in part and denied in part.

(8) Date of result: August 21, 2019.

 (b) If you filed any second petition, application, or motion, give the same information: N/A

(c) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition: Appeal by the State and Cross Appeal by the Petitioner. The Florida Supreme Court reversed the postconviction relief granted by the lower court and affirmed the order denying relief in all other respects. The State appealed and Mr. Mullens cross-appealed. The Florida Supreme Court reversed.

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**GROUND ONE**

**THE STATE'S CIRCUMSTANTIAL EVIDENCE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT THE MURDER WAS COMMITTED TO AVOID ARREST BECAUSE THE EVIDENCE WAS CONSISTENT WITH MR. MULLENS ACTING IMPULSIVELY IN A RAGE OR PANIC AFTER HE SAW THE STORE OWNER ON THE TELEPHONE. THIS VIOLATED MR. MULLENS'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT.  THE STATE COURT DECISIONS ON THIS MATTER WERE CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AND/OR BASED ON AN UNREASONABLE FINDING OF FACT.**

**(a) Supporting facts:**

The State failed to prove that the murders were "committed for the purpose of avoiding or preventing a lawful arrest" as provided in section 921.141(5)(e), Florida Statutes. The State had the burden of proving this aggravating factor beyond a reasonable doubt and attempted to do so based on circumstantial evidence that did not overcome all reasonable doubt. The video recordings that were entered into evidence fell far short of the proof necessary to find this aggravating factor and to rely on it to impose death.

To meet its burden, the State was required to show beyond a reasonable doubt that the sole or dominant motive for the killing was to eliminate a witness, and mere speculation on the part of the State that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator. The mere fact that the victim knew and could identify Mr. Mullens, without more, is insufficient to prove this aggravating factor beyond a reasonable doubt.

While at the time of trial, the State could present circumstantial evidence to prove the aggravating factor, this burden of proof could only be met if the evidence is "inconsistent with any reasonable hypothesis which might negate the aggravating factor." The evidence must also be competent and substantial. Even logical inferences drawn by the trial court will not suffice to support a finding of a particular aggravating circumstance when the State's burden has not been met. When deciding the applicability of the avoid arrest aggravator, courts cannot assume the defendant's motive.

In this case, Mr. Mullens made no statements evincing his intent behind the murders. Because there was no direct evidence to support the aggravator, the evidence was entirely circumstantial. The trial court inferred Mr. Mullens's intent based on his actions as depicted in the videotapes, finding, "[I]t is clear from the surveillance videos that the murders of Uddin and Hayworth were solely motivated for the purpose of evading capture." 11:R1597.

The video recordings show that just before the murders occurred, Mr. Peeples left the store to get Mr. Uddin's car. Mr. Mullens was standing by the door with the gun down at his left side talking to Mr. Uddin, who said something about his car. Mr. Mullens looked as if he were preventing Mr. Uddin from following Mr. Peeples, but otherwise he was calm, and he was not acting aggressively. Mr. Mullens moved toward the door and opened it as if he were looking for Mr. Peeples. Mr. Uddin must have thought Mr. Mullens was leaving the store because he picked up the phone and dialed it.

8

Mr. Mullens turned back toward Mr. Uddin and saw him with the telephone to his ear. One of the video recordings clearly shows that Mr. Mullens jumped as if surprised. 14:R2195 at 6:45:27. Mr. Mullens rushed over to Mr. Uddin, aimed the gun at him, and directed him to hang up the phone, which had fallen to the floor when Mr. Uddin tried to hang it up. Mr. Mullens seemed angry. 14:R2195, 2196. Both men were highly agitated, and Mr. Uddin grasped Mr. Mullens's hand and arm. Mr. Mullens, who was pointing the gun at Mr. Uddin, argued with, and yelled at Mr. Uddin and pointed to the phone on the floor. 14:R2195.

Mr. Uddin reached down to pick up the phone with Mr. Mullens leaning over him with the gun. Mr. Uddin pushed Mr. Mullens's left arm, which was holding the gun. 14:R2195, 2196. There is a sound as if the gun went off, which would have sent a bullet toward the wall. At that point, Mr. Uddin became frantic and began waving his arms in Mr. Mullens's direction and screaming. Mr. Uddin weaved to stay away from the gun, but Mr. Mullens shot Mr. Uddin in the head as Mr. Uddin was screaming and moving. 14:R2195, 2196.

The shootings occurred very rapidly. Mr. Uddin was shot less than 20 seconds after Mr. Mullens discovered him on the phone. 14:R2195 at 6:45:27 to 6:45:45. Mr. Mullens shot Mr. Hayworth approximately 9 seconds later. 14:R2195 at 6:45:54. Mr. Barton entered the store approximately 6 seconds after that. 14:R2195 at 6:46:00. The first shot aimed at Mr. Barton occurred during the scuffle and the last shot aimed at Mr. Barton 14:R2195 at 6:46:21 occurred only 36 seconds or so after Mr. Uddin was shot and within a minute after Mr. Mullens saw Mr.

Uddin on the phone.

The mental mitigation also supports the inference that the murders were an impulsive reaction. The evidence was uncontroverted that Mr. Mullens had Bipolar Disorder at the time of the offenses. He was off his medication and consuming alcohol and illegal drugs. Dr. Machlus testified that people with both Bipolar Disorder and substance abuse act impulsively. They are six times more likely to commit violent crimes than people who suffer from Bipolar Disorder alone. Witnesses who knew Mr. Mullens testified that he was impulsive and easily enraged, and that he acted without having any consideration for the possible consequences of his actions, and the court found that Mr. Mullens's impulsivity was established as nonstatutory mitigation. 11:R1605. Witnesses also testified that Mr. Mullens would misperceive situations and become overly aggressive at minor provocations.

Because the shootings occurred in such a short amount of time after Mr. Mullens saw Mr. Uddin on the phone, the evidence is consistent with a conclusion that the murders were the product of impulse or instinct, incited by rage or panic and perpetrated by an impulsive young man who is mentally ill, drug addicted, and of low intelligence, and has a history of irrational behavior, reactive thinking, and low tolerance for stress. The evidence is also consistent with a theory that the irrational impulse lasted for around a half a minute and did not dissipate until Mr. Mullens pushed Mr. Barton to the floor and began picking up the bag containing items stolen from the store.

In support of the "avoid arrest" aggravator, the trial judge reasoned that Mr. Uddin had not resisted the robbery: "Uddin had not resisted the Defendant or Peeples during the entire course of the robbery, he was positioned in a confined space behind the front counter, and did not pose any kind of threat to the Defendant whatsoever." However, the order fails to acknowledge that Mr. Peeples and Mr. Mullens were angry with Mr. Uddin when he frustrated their attempts to steal his car. They had to threaten him and ask him repeatedly for the keys, and although they pointed a gun at him, Mr. Uddin would not relinquish the keys. The court also overlooked the fact that Mr. Uddin's dialing the phone was an act of resistance that Mr. Mullens was not expecting.

In this case, Mr. Peeples left the store first to get the car. Obviously, it would have taken time to find the car, start it, and bring it to the store. Therefore, it made sense that Mr. Peeples would have Mr. Mullens stay behind to watch Mr. Uddin until they were ready to leave. In fact, in his statement to police, which was introduced into evidence by the prosecution, Mr. Peeples said: "Well, he supposed to stay in the store until I crank the car up. And then let them go." When asked if Mr. Mullens was going to hold them until he got the car, Mr. Peeples said, "Until I got in the car and got – pulled the car up some. But . . . I was going around to, like – turned the corner right there and then turned around in the alley and came back." 13:R2126.

If the men had intended to eliminate Mr. Uddin and Mr. Hayworth as witnesses, they would have killed them and left together to get the car. Instead, Mr.

Mullens was left behind to watch Mr. Uddin and Mr. Hayworth to allow Mr. Peeples time to bring the car closer to the store so Mr. Mullens could jump into it.

There is absolutely no evidence on the videos that Mr. Mullens saw Mr. Peeples with Mr. Uddin's car when he looked out the door. The outside video does not show Mr. Peeples in Mr. Uddin's car. 14:R2200. The camera is frozen at the time Mr. Mullens looked out the door and Mr. Uddin grabbed the phone. Mr. Uddin can be heard screaming, but the camera image does not move. Therefore, the court's finding that Mr. Mullens could have simply left to join Mr. Peeples at that time is unsupported. ("At that point, had the Defendant not intended to murder Uddin and Hayworth he would have simply left the store entirely and joined Peeples in Uddin's car." 11:R1597.

It is also important to note that Mr. Mullens did not kill Mr. Barton. Even though Mr. Barton was shot, it is clear from the video that he was not incapacitated. Mr. Barton fought and struggled with Mr. Mullens even after he was shot. Mr. Mullens pushed Mr. Barton away from him and to the floor and then broke off the attack. Mr. Barton was still very much alive. He was moving and making sounds, and Mr. Mullens would have seen that Mr. Barton was trying to stand up. 14:R2197, 2199.

Nevertheless, Mr. Mullens seemed unconcerned that Mr. Barton was still alive. He calmly stopped the attack, slowly and deliberately picked up a shopping bag filled with lottery tickets and walked to the door. 14:2195, 2199. It took approximately 9 seconds for him to stuff the items back in the bag and head for the

door. In fact, Mr. Mullens took the time to bend down and pick up something he dropped in the process. 14:R2195 at 6:46:28 to 6:46:37 and 6:46:40. He did not begin to jog until he left the store and saw Mr. Peeples at the corner in the car.

If these murders and the attempted murder were committed to eliminate witnesses, Mr. Mullens would have killed Mr. Barton. In this case, Mr. Mullens could have killed Mr. Barton because, as Mr. Peeples said in his statement, there was a bullet left in the revolver, which is consistent with the fact that police found one bullet in the car. 6:R942; 13:R2129-30.

Thus, the trial court weighed an aggravating factor that was not proven beyond a reasonable doubt, thus denying Mr. Mullens due process under the Fourteenth Amendment. Additionally, when the trial court's improper disregarding of a substantial amount of nonstatutory mitigation which must be reevaluated along with the mitigation presented in postconviction, Mr. Mullens's death sentence is excessive and arbitrary and capricious under the Eighth Amendment.

The Florida Supreme Court held:

The only evidence that establishes the avoid arrest aggravating circumstance in this case is the surveillance footage from inside the store. We conclude that the footage provides competent, substantial evidence that supports the findings of the trial court that Mullens acted with the sole or dominant intent to eliminate Hayworth and Barton as witnesses who might identify him to law enforcement. Regarding the murder of Uddin, the surveillance footage reveals that Mullens quickly shot Uddin after he saw Uddin with a phone in his hand. [ ]

We therefore conclude that the trial court incorrectly applied the law

regarding the avoid arrest aggravating circumstance with respect to the murder of Uddin.

However, Mullens's actions following the murder of Uddin indicate that he acted with the primary intention of avoiding arrest and prosecution. After Uddin was shot, Mullens walked away from Uddin and, instead of exiting the store, Mullens searched for Hayworth, who did not block Mullens's exit. As the trial court noted in its sentencing order:

> Finding him in one of the store's aisles, the Defendant forcefully grabbed Hayworth's arm and spun him about, getting him into a position where he could be more easily shot. Hayworth was not resisting the Defendant and was pleading for the Defendant to let him live. Ignoring Hayworth's pleas, the Defendant raised the revolver and fired a shot into Hayworth's head. Like Uddin, Hayworth had been passive and submissive during the robbery and remained so up until his death. He had obeyed all orders from the Defendant and Peeples and stood exactly where they told him to during the robbery. Hayworth posed absolutely no threat to the Defendant.

[ ] Further, Mullens began to exit the store and had placed the gun in his pocket when Barton attempted to enter. When Barton hesitated, Mullens grabbed Barton, dragged him into the store, and engaged in an altercation with Barton that resulted in Mullens firing several shots at Barton before Mullens ultimately exited the store. Additionally, Mullens took with him the inoperative surveillance equipment that Peeples had earlier disconnected and removed from its shelf, and neither Mullens nor Peeples wore masks. [ ] These actions clearly constitute sufficient circumstantial evidence that Mullens's sole or dominant intent in killing Hayworth and attempting to kill Barton was to eliminate them as witnesses. Therefore, we affirm the finding of the avoid arrest aggravating circumstance.

The Florida Supreme Court's decision on this matter, and indeed the initial decision of the trial court were contrary to, or an unreasonable application of, clearly established law, and based on an unreasonable finding of fact.

**(b)** If you did not exhaust your state remedies on Ground One, explain why: This

claim was exhausted on direct appeal.

**(c) Direct Appeal of Ground One:**
(1) If you appealed from the judgment of conviction, did you raise this issue? Yes
(2) If you did not raise this issue in your direct appeal, explain why: N/A

**(d) Post-Conviction Proceedings:** N/A

**(e) Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: N/A

## GROUND TWO

**THE TRIAL COURT VIOLATED THE EIGHTH AMENDMENT BY FAILING TO CONSIDER MR. MULLENS'S NONSTATUTORY MENTAL, BACKGROUND, AND CHARACTER MITIGATION AND BECAUSE THE TRIAL COURT MADE FACTUAL ERRORS THAT LED THE TRIAL COURT TO IMPROPERLY REJECT OR IMPROPERLY WEIGH THE MITIGATION, IN VIOLATION OF THE EIGHTH AMENDMENT'S REQUIREMENT THAT MITIGATION BE CONSIDERED AND WEIGHED IN AN INDIVIDUALIZED SENTENCING. THE STATE COURT DECISIONS ON THIS MATTER WERE CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AND/OR BASED ON AN UNREASONABLE FINDING OF FACT.**

**(a)    Supporting facts:**

The trial court, as affirmed by the Florida Supreme Court, violated the Eighth Amendment by failing to consider mitigating factors numbered 1 through 15, 21, 32, and 33 as nonstatutory mitigation because, whether or not they support the statutory mitigation found by the judge, they were specifically listed by Mr. Mullens in his sentencing memorandum and are evidence of factors in his background that would mitigate against the imposition of the death penalty. This

resulted in a decision that was contrary to or an unreasonable application of clearly established federal law and/or based on an unreasonable finding of fact. This Court should grant the writ.

The United States Supreme Court has held that a sentencing jury or judge may not preclude consideration of any evidence regarding a mitigating circumstance that is proffered by a defendant in order to receive a sentence of less than death. Even though a proposed mitigating circumstance does not reduce culpability for the defendant's crime, it can be mitigating in the sense that it might serve as the basis for a sentence less than death. The law does not require that a proffered mitigating circumstance have any specific nexus to a defendant's actions for the mitigator to be given weight. Non-statutory mitigation need not have a nexus between the mitigation and the crime. A trial court must expressly evaluate all statutory and nonstatutory mitigators a defendant has proposed.

A mitigating circumstance can be any aspect of a defendant's character or record and any of the circumstances of the offense that reasonably may serve as a basis for imposing a sentence less than death. Valid nonstatutory mitigating circumstances include but are not limited to the following: 1) Abused or deprived childhood; 2) Contribution to community or society as evidenced by an exemplary work, military, family, or other record; 3) Remorse and potential for rehabilitation and good prison record; 4) Disparate treatment of an equally culpable codefendant; and 5) Charitable or humanitarian deeds.

Mr. Mullens listed 35 circumstances as nonstatutory mitigation in his

sentencing memorandum; however, the sentencing order states that Mr. Mullens "asserted thirty-one nonstatutory mitigating factors." 10:R1573-77; 11:R1604. The court refused to consider the circumstances in paragraphs 1 through 15 and paragraph 21 in Mr. Mullens's sentencing memorandum as nonstatutory mitigation, stating that because they had been addressed in the two statutory mitigators, they would not be considered again. 11:R1604.

Mr. Mullens also listed as nonstatutory mitigating circumstances that he was "protective and nurturing to his younger sister Kendra Mullens" (number 32), and that he "was kind and helpful to Michael Wonka while living in his home" (number 33). 10:R1577. The court failed to address these circumstances entirely, and they were not mentioned in the sentencing order.

The nonstatutory mitigating circumstances listed by Mr. Mullens but dismissed by the trial court were: (1) Mr. Mullens was born with a genetic predisposition to psychological disorders; (2) Mr. Mullens is genetically predisposed to substance abuse; (3) Mr. Mullens was exposed to severe parental conflict; (4) Mr. Mullens was exposed to and victimized by child abuse and neglect; (5) Mr. Mullens had poor parental attachment; (6) Mr. Mullens was exposed to family drug and alcohol abuse; (7) Mr. Mullens was exposed to family criminal behavior; (8) Mr. Mullens suffered from violence inflicted by his older brother, Wesley Mullens; (9) Mr. Mullens suffered from residential instability; (10) Mr. Mullens was raised in poverty; (11) Mr. Mullens performed poorly in school; (12) Mr. Mullens was incarcerated in an adult penal facility as a juvenile; (13) Mr.

Mullens suffers from Bipolar I Disorder; (14) Mr. Mullens suffers from the psychological disorder of Polysubstance Abuse; (15) Mr. Mullens suffers from a personality disorder; and (21) Mr. Mullens was taught by his father to commit crimes by the time he was five years old. 10:R1573-74.

The state courts violated the Eighth Amendment by failing to consider the mitigation in paragraphs 1 through 15 and 21 as nonstatutory mitigation because nonstatutory or "catch-all" mitigators are reasons peculiar to the defendant's background that would "mitigate against imposition of the death penalty." Whereas, as noted by the court in the sentencing order, the statutory mental mitigators (that the murders "were committed while the Defendant was under the influence of extreme mental or emotional disturbance" and that the "capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired") apply specifically to the mindset of the defendant during the crime itself.

A mitigating circumstance can be any aspect of a defendant's character or record and any of the circumstances of the offense that reasonably may serve as a basis for imposing a sentence less than death. In this case, in addition to rejecting mental mitigation as nonstatutory mitigation, the court failed to address the mitigation in paragraphs 32 and 33 altogether.

Evidence of contributions to family, community, or society reflects on character and provides evidence of positive character traits to be weighed in mitigation. Therefore, Mr. Mullens's kindness and helpfulness to Michael Wonka

and the fact that he was protective and nurturing of his baby sister should have been considered by the court.

The error in segregating the statutory mental mitigation from the nonstatutory mitigation also colored the court's evaluation of the nonstatutory mitigators which were actually addressed by the court. For example, in Section C of the nonstatutory mitigation in the sentencing order, "the Defendant is immature, impulsive and easily manipulated," the court totally overlooked the fact that Dr. Machlus testified that people who suffer from Bipolar I Disorder are impulsive and do not act with rational judgment. 9:R1376. In other words, Mr. Mullens's impulsivity is part of his mental illness, and the court should not have excluded Mr. Mullens's mental condition in weighing this mitigator simply because the fact that he is Bipolar was considered as statutory mitigation.

In Section A of the nonstatutory mitigation, "The Defendant was sexually abused as a child and also while in prison," the trial court rejected the mitigator as unproven without mentioning that Dr. Machlus testified that Mr. Mullens was sexually abused on eight separate occasions in prison and that Mr. Mullens reported he was sexually abused by his stepfather when he was a child. 10:R1401. This evidence should have been considered because it was uncontroverted and the prosecution did not object to this evidence. It was admissible as substantive evidence pursuant to section 90.803(4), Florida Statutes as an exception to the hearsay rule, because the statements were made to Dr. Machlus for purposes of his diagnosis and evaluation of Mr. Mullens and Mr. Mullens knew that this

information was being used for such purposes.

Taken as a whole, the errors in the sentencing order are not harmless. There were 18 nonstatutory aggravating circumstances that were not considered, one that was improperly weighed (impulsivity), and one that was improperly rejected (sexual abuse). As argued in Ground I above, the court erred in finding that the murders were committed in an attempt to avoid arrest. Therefore, the court would be left with two aggravators to be reweighed against substantial mitigation.

At the end of the hearing, Mr. Mullens's counsel argued to the court, "[Y]ou can't get much more broken than Khadafy Mullens is. . . . We're only asking for a sentence that fits the whole person who did these terrible deeds." 10:R1510. A trial court must consider all factors that mitigate against the possibility of the death penalty. Therefore, in this case, the court must consider whether the death penalty is appropriate punishment for someone who suffered through a bleak and deprived childhood and mental illness, all of which he did not choose, and none of which was ameliorated by outside intervention. Because Mr. Mullens had no external or internal resources to compensate for the damage done to him by his family and his heritable mental illness, after he got out of prison in 2007, he most certainly needed intensive institutionalized help along with psychiatric medication in order to function responsibly. Ironically and tragically, he got that help only after he committed these horrific crimes and was placed on the proper medication in a controlled residential setting, which turned out to be a county jail.

The Florida Supreme Court held, "that there is no merit to these claims."

The court discussed harmless error and found:

> The trial court below found that the State had proven beyond a reasonable doubt three aggravating circumstances: prior violent felony (great weight); committed during the course of a robbery, merged with pecuniary gain (great weight); and avoid arrest (great weight). The court noted that the prior violent felony included both an earlier conviction for aggravated battery and convictions for the murders of Uddin and Hayworth and the attempted murder of Barton. It also found that Mullens established two statutory mitigating circumstances: (1) Mullens committed the crimes under the influence *31 of an extreme emotional or mental disturbance (moderate weight); and (2) his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired (moderate weight). The court made the following findings with respect to nonstatutory mitigating circumstances: (1) Mullens was sexually abused as a child and while in prison (not established; no weight); (2) his mental illness can be treated (some weight); (3) he is immature, impulsive, and easily manipulated (little weight); (4) he acted under the domination and control of Peeples (some weight); (5) he has a low IQ and poor academic achievement scores (little weight); (6) he took responsibility for his crimes (little weight); (7) he has loving and supportive family and friends (little weight); (8) his family members considered him to be "too far gone" by the age of ten years old (not proven; no weight); and (9) his father named him after Muammar Gaddafi (not mitigating; no weight).

Regarding the number of proposed mitigating circumstances, the court held "that Mullens is not entitled to relief on this claim." The Florida Supreme Court found that the lower court,

> did not overlook the proposed circumstance that Mullens was kind and helpful to Wonka, but in fact referenced the testimony of Wonka as part of the general nonstatutory category that Mullens has loving and supportive friends and family. This factor was assigned little weight. Regarding Mullens's relationship with his sister, Kendra, it appears that the trial court considered this to be part of the statutory mitigation that Mullens's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, although the court did not indicate that this

circumstance was one of the sixteen circumstances already considered as statutory mitigation.7 In finding that this statutory mitigating circumstance applied, the court referenced the impoverished childhoods that Mullens and his siblings endured, as well as the abuse inflicted on Mullens, his mother, and his siblings by Mullens's father. Because the court did consider the effects that Mullens's difficult childhood had on himself and his family as mitigation, we conclude that any error by the trial court in overlooking Mullens's relationship with his late sister Kendra is harmless, particularly in light of the fact that the trial court found the existence of three aggravating circumstances and assigned great weight to each. [ ]

With respect to the discrepancy in the number of proposed nonstatutory mitigating circumstances, we conclude that any error is also harmless. [ ] Other than the two allegedly absent factors considered above or the errors discussed below, Mullens does not indicate which specific nonstatutory mitigating circumstances the trial court may have overlooked. Although the trial court found that two statutory mitigating circumstances were established, each meriting moderate weight, and seven established nonstatutory mitigating factors ranging from none to some weight, such mitigation did not outweigh the great weight assigned to each of three aggravating circumstances. We therefore conclude that there was no reasonable possibility that a lesser sentence would have been imposed in the absence of such an error.

Regarding the refusal to reconsider statutory mitigation as nonstatutory mitigation, the court "conclude[d] that the trial court did not err in refusing to find that the factors that supported Mullens's statutory mitigation also qualified as nonstatutory mitigation." The court found that "there [wa]s no purpose to be served by requiring trial courts to recount factors as both statutory and nonstatutory mitigation."

Finally, the court affirmed the lower court's refusal to consider Mr. Mullens's sexual abuse, because the lower court properly concluded that there was no competent and substantial evidence supporting this nonstatutory mitigation.

The Florida Supreme Court's decision on this matter, and indeed the initial decision of the trial court, were contrary to, or an unreasonable application of, clearly established law, and based on an unreasonable finding of fact.

**(b)** If you did not exhaust your state remedies on Ground Two, explain why: This claim was exhausted on direct appeal.

**(c) Direct Appeal of Ground Two:**
(1) If you appealed from the judgment of conviction, did you raise this issue? Yes
(2) If you did not raise this issue in your direct appeal, explain why: N/A

**(d) Post-Conviction Proceedings:** N/A

**(e) Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: N/A

## GROUND THREE

**MR. MULLENS'S DEATH SENTENCE IS EXCESSIVE PUNISHMENT, ARBITRARY AND CAPRICIOUS BECAUSE HIS CASE IS NOT ONE OF MOST AGGRAVATED AND LEAST MITIGATED CASE BECAUSE OF HIS SUBSTANTIAL MITIGATION THUS VIOLATING THE EIGHTH AMENDMENT. THE STATE COURT DECISIONS ON THIS MATTER WERE CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AND/OR BASED ON AN UNREASONABLE FINDING OF FACT.**

**(a) Supporting facts:**

In this case, the trial court found three aggravating circumstances had been proven: that Mr. Mullens was previously convicted of a felony involving the use or threat of violence or a capital felony, that the murders were committed during a robbery, and that the murders were committed for the purpose of avoiding or

preventing a lawful arrest. However, as argued above, the evidence supporting the "avoid arrest" aggravator was insufficient, and it should be stricken.

The trial court found the existence of both of the statutory mental mitigators and accorded them moderate weight. The court also found extensive nonstatutory mitigation, including the fact that Mr. Mullens's proven mental illness can be successfully treated, that he was immature, impulsive, and easily manipulated, that he was acting under the dominion and control of co-defendant Mr. Peeples, that Mr. Mullens has a low IQ and poor academic achievement, that Mr. Mullens took responsibility for his crimes by entering a guilty plea, and that Mr. Mullens had a loving and supportive family.

In this case, the evidence firmly established that Mr. Mullens's childhood was bleak. Mr. Mullens was raised by an alcoholic mother who left him and his brother and sister in the care of an older sibling while she worked. Mr. Mullens's father was a drug addict who beat Mr. Mullens's mother and the children and stole the family's money to buy drugs, leaving them hungry, and at times, without shelter or utilities. During Mr. Mullens's childhood, Mr. Mullens's father was verbally abusive with an explosive temper, and he was eventually convicted of murder and sent to prison when Mr. Mullens was a child. Mr. Mullens's father is Bipolar, which is a heritable condition.

Mr. Mullens's family lived in extreme poverty. The most stable residence the family had was described as a bug-infested and dirty shack. During his childhood, Mr. Mullens lacked proper food, clothing, and hygiene, and the children were taught to steal food to feed themselves. Mr. Mullens's older brother was physically

and emotionally abusive toward Mr. Mullens, and Mr. Mullens stole things at his brother's behest. Except for during short vacations with an uncle, Mr. Mullens had no appropriate role models.

Mr. Mullens's academic achievement was extremely poor and his IQ is below average. He started exhibiting signs of mental illness when he was in his early teens, and there were indications that he began to hallucinate around that time. He also started drinking, huffing, and using drugs about the same time as his mental illness was emerging.

Mr. Mullens was sent to adult prison when he was only 16 years old, and the evidence is uncontroverted that when he emerged, he exhibited signs of debilitating mental illness. By the time he left prison in 2007, his mental health had deteriorated to such a degree that his own mother thought he would be better off dead and she considered poisoning him.

Mr. Mullens suffers from Bipolar I Disorder with psychotic symptoms and he has traits of several personality disorders that he acquired as dysfunctional survival mechanisms. He has trouble dealing with stress and he tends to react instead of thinking things through. Mr. Mullens is also addicted to drugs, and the evidence was unrefuted that he would do anything if he thought it would result in his getting drugs, a trait he seems to have inherited from his drug-addicted mentally ill father. In fact, substance abuse runs in Mr. Mullens's family. His grandparents were alcoholics and Mr. Mullens's youngest sister died from a drug overdose while Mr. Mullens was awaiting trial.

Mr. Mullens's expert testified that people with Bipolar Disorder act impulsively. In corroboration, Mr. Mullens's family members testified that Mr. Mullens has always acted impulsively and without an innate understanding of consequences. They also testified that he is a follower, that he is easily manipulated, and that others have used him to steal for them.

Witnesses testified that, although Mr. Mullens had been prescribed medication in prison, at the time of the murders, he was not taking the medication. Instead, he was both snorting and smoking cocaine and using alcohol. In the weeks before the murders he was exhibiting signs of mental illness, and after his arrest, Mr. Mullens's thought processes were incoherent. Before he was properly medicated, Dr. Machlus was unable to evaluate him because his behavior was absurdly inappropriate and compulsive.

The Florida Supreme Court held that competent, substantial evidence supported the findings of the trial court regarding aggravation and mitigation, and thus affirmed the imposition of the death penalty. The Florida Supreme Court's decision on this matter, and indeed the initial decision of the trial court were contrary to, or an unreasonable application of, clearly established law, and based on an unreasonable finding of fact.

**(b)** If you did not exhaust your state remedies on Ground Three, explain why: This claim was exhausted on direct appeal.

**(c) Direct Appeal of Ground Three:**
(1) If you appealed from the judgment of conviction, did you raise this issue? Yes
(2) If you did not raise this issue in your direct appeal, explain why: N/A

**(d) Post-Conviction Proceedings:** N/A

**(e) Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: N/A

### GROUND FOUR

**THE STATE POSTCONVICTION COURT CORRECTLY FOUND THAT TRIAL COUNSEL PERFORMED DEFICIENTLY DURING THE PENALTY PHASE AND THAT THAT THIS DEFICIENCY WAS PREJUDICIAL. THE FLORIDA SUPREME COURT'S REVERSAL OF MR. MULLENS'S PENALTY PHASE RELIEF ON THIS MATTER WAS CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AND/OR BASED ON AN UNREASONABLE FINDING OF FACT.**

**(a) Supporting facts:**

Trial counsel had a duty to conduct a thorough investigation of Mr. Mullens's social and medical history. They failed to do so at every turn. Counsel knew that Mr. Mullens's mother had regularly abused drugs and alcohol while she was pregnant with him, yet they did not investigate the possibility of fetal alcohol spectrum disorder. Counsel knew that Mr. Mullens likely suffered from intellectual disability and organic brain injury—due to both fetal alcohol spectrum disorder and repeated head trauma—yet they failed to order neuropsychological testing to confirm it. Counsel knew that Mr. Mullens had been repeatedly sexually abused and raped, yet they failed to substantiate that fact with available evidence. And counsel knew that Mr. Mullens exhibited all of the tell-tale signs of posttraumatic stress disorder ("PTSD"), yet they failed to investigate further or put on any

evidence of PTSD at Mr. Mullens's sentencing.

Armed only with a woefully incomplete picture of Mr. Mullens's tragic history of abuse and mental health problems, trial counsel then failed to construct even a minimal explanation of Mr. Mullens's mental state at the time of the crime. Counsel knew that only six days before the crime, Mr. Mullens's stepfather, who had sexually abused and raped him for years, died suddenly, and that Mr. Mullens's mother had insisted that Mr. Mullens attend his abuser's funeral. Counsel knew that Mr. Mullens committed the crime the day before his abuser's funeral while under extreme mental and emotional stress, compounded by heavy drug and alcohol use. Yet counsel failed to present this narrative at sentencing, much less connect the mitigating evidence to Mr. Mullens's mental state at the time of the crime. This left the sentencing court to speculate about the relevance of Mr. Mullens's background and history of mental health problems. And it rendered the paltry evidence counsel did present disjointed, unpersuasive, and ineffective.

Beyond those failings, counsel also engaged only one expert witness, Dr. Machlus, when prevailing norms in capital litigation dictate a team approach including psychiatrists and neuropsychologists. And Dr. Machlus was utterly unfit for the task. He had never worked on a capital case before—a fact that was evident at every stage. He failed to identify Mr. Mullens's organic brain damage, failed to administer psychological tests according to professional standards, made errors in scoring tests, repeatedly relied on psychological diagnoses without first ruling out medical causes (such as brain damage), repeatedly administered prejudicial

personality tests, failed to diagnose fetal alcohol spectrum disorder, and failed to diagnose PTSD due to repeated childhood physical and sexual abuse. Counsel compounded these errors by failing to correct obvious mistakes in Dr. Machlus's work, such as his false assertion that Mr. Mullens had no history of head injury and his failure to recognize obvious signs of PTSD.

Not one of counsel's numerous failures can be ascribed to trial strategy. As trial counsel testified—no less than four times—the only explanation for each of these missteps was that counsel "did a bad job." PCR/1654; PCR/1687; PCR/1698. These errors—both individually and collectively—contributed to a performance that fell well below prevailing professional norms under this Court's precedents. The trial court therefore correctly determined that counsel's conduct was deficient.

Trial counsel's performance is deficient if it falls below "an objective standard of reasonableness" based on "prevailing professional norms." Counsel had an "obligation to conduct a thorough investigation of the defendant's background" for the purpose of uncovering mitigation evidence for the sentencing phase. It is not enough—especially in a capital case—for counsel merely to conduct *some* investigation. In a case where the ultimate punishment may be imposed, counsel's investigation must be "*thorough.*" The duty to engage in a thorough investigation goes to the heart of counsel's responsibilities as an adviser and advocate: "[c]ounsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel

has first conducted a thorough investigation." The need for thorough investigation of all potential lines of inquiry on mitigation is especially acute where counsel's stated strategy is to concede guilt to focus on presenting a compelling case at sentencing.

### 1. Trial counsel failed to investigate and present evidence of fetal alcohol spectrum disorder, intellectual disability and organic brain damage, sexual abuse, and PTSD.

#### a. Trial counsel failed to investigate and present evidence that Mr. Mullens suffers from fetal alcohol spectrum disorder.

Trial counsel were aware that Mr. Mullens's mother drank while pregnant and that Mr. Mullens displayed the classic symptoms of fetal alcohol spectrum disorder ("FASD"), a devastating and permanent brain condition caused by exposure to alcohol *in utero*. Yet trial counsel failed to investigate or present any evidence of fetal alcohol spectrum disorder at sentencing. The postconviction court therefore correctly found that counsel's failure to investigate evidence that Mr. Mullens suffers from fetal alcohol spectrum disorder was deficient performance.

Trial counsel uncovered ample evidence that should have prompted further investigation into the effects of fetal alcohol consumption on Mr. Mullens's behavior as an adult and his culpability for the underlying offenses. Mr. Mullens's mother, Cassandra Washington, told two members of the defense team (Ms. Menadier and Ms. Miller) that she drank regularly when she was pregnant with Mr. Mullens. PCR/1471; PCR/1686–87. Further investigation would have revealed that Mr. Mullens's mother did not receive any prenatal care whatsoever, or even

take prenatal vitamins. PCR/2073–74. Instead, she played card games while drinking Bacardi and Olde English on a daily basis. PCR/2075. Mr. Mullens's mother also regularly used marijuana and cocaine while she was pregnant with him. PCR/2071.

Consuming alcohol while pregnant causes fetal alcohol spectrum disorder, a permanent and incurable brain condition caused by alcohol's adverse effects on fetal brain development. PCR/1871; PCR/1923; PCR/2109–11. Fetal alcohol spectrum disorder diminishes development of the frontal lobe (the brain structure that is associated with understanding cause and effect and the consequences of one's actions, interpreting information, and controlling urges, (PCR/2125–26) and the corpus callosum (the brain structure that is responsible for communicating information throughout the brain for interpretation and processing, (PCR/1914–16, PCR/2115–17), and it is the single most common nongenetic cause of intellectual disability. PCR/2297. The disorder is associated with numerous, permanent adverse health outcomes, including low IQ, mood disorders, substance abuse, a lifelong pattern of impulsive and aberrant behavior, learning disabilities, and attention deficit hyperactivity disorder. PCR/2118–19.

Mr. Mullens's lead trial counsel was aware of the health effects of fetal alcohol spectrum disorder and its common use as a mitigating factor in sentencing proceedings. PCR/1723–24; PCR/1779–80. Ms. Menadier testified that "fetal alcohol is always a concern" when developing mitigation evidence. Op. 17–18. (PCR/2937– 38). Ms. Miller specifically recognized that Mr. Mullens potentially

suffered from fetal alcohol spectrum disorder and raised the issue with the rest of the defense team. PCR/1686–87. Yet, despite all of the warning signs, no one on Mr. Mullens's defense team followed up because, as counsel later admitted, they "did a bad job." PCR/1686. Due to counsel's failure to investigate further, an issue that should have been obvious to any competent capital defense lawyer within five minutes of meeting Mr. Mullens was not presented at sentencing: "[T]here was no testimony or evidence presented during the penalty phase that Cassandra drank during her pregnancy with Mr. Mullens. There was no presentation or even suggestion of fetal alcohol syndrome or spectrum disorder during the penalty phase." Op. 17 (PCR/2937).

On postconviction review, the court received competent, substantial testimony and other evidence that Mr. Mullens suffers from fetal alcohol spectrum disorder, which the court found "to be *credible and compelling* to a mitigation presentation." Op. 23 (PCR/2943) (emphasis added). The court heard from both Ms. Miller and Ms. Menadier that Mr. Mullens's mother admitted to drinking regularly while pregnant with him. PCR/1471; PCR/1686–87; *see* Op. 17 (PCR/2937) ("Menadier testified that she had personal knowledge that Cassandra drank alcohol during her pregnancy [with] Mr. Mullens from Cassandra herself, Mr. Mullens' older siblings, and Mr. Mullens' father."). And Mr. Mullens's father testified that he had personally witnessed Mr. Mullens's mother drink and use illegal drugs while pregnant with Mr. Mullens. PCR/2071; PCR/2075. The court also heard expert testimony that Mr. Mullens exhibited neuropsychiatric

conditions consistent with fetal alcohol spectrum disorder. Op. 18–19 PCR/2938–39. And Dr. Maher testified that Mr. Mullens's mother's alcohol and drug use "had an undeniable, clear and relentless influence on his brain development during gestation." PCR/2108. The postconviction court thus concluded that, "given the well-known fact of the mother's heavy drinking during Mr. Mullens' youth and the psychiatric conditions Mr. Mullens[] exhibited, the Court believes that this should have suggested to counsel, the mitigation specialist [Ms. Cunningham], and Dr. Machlus to explore the possibility of the mother's drinking during pregnancy and the effects on Mr. Mullens resulting from his mother's consumption of alcohol while pregnant." Op. 18 (PCR/2938).

Trial counsel were not deficient merely for failing to call Mr. Mullens's mother to testify about drinking while pregnant; they were deficient for failing even to *investigate* whether—and to present *any* evidence that— Mr. Mullens suffers from fetal alcohol spectrum disorder. Even without any testimony from Mr. Mullens's mother, competent counsel would have engaged an expert to investigate whether Mr. Mullens suffers from fetal alcohol spectrum disorder. That is precisely what happened on postconviction review.

Unlike Mr. Mullens's other disorders, fetal alcohol spectrum disorder diminishes development of the frontal lobe and the corpus callosum, (PCR/2115–17), causing "permanent abnormal brain development." Op. 18 (PCR/2938). Unlike Mr. Mullens's other disorders, fetal alcohol spectrum disorder is the single most common nongenetic cause of intellectual disability. PCR/2297. And, unlike

Mr. Mullens's other disorders, fetal alcohol spectrum disorder has a known and directly traceable cause: Mr. Mullens's mother's decision to drink while pregnant. In other words, evidence of fetal alcohol spectrum disorder not only reduces Mr. Mullens's culpability, it provides support for his diagnosis of intellectual disability and organic brain damage.

The *only* expert to testify about fetal alcohol spectrum disorder—whether at sentencing or on postconviction review—was Dr. Maher, who diagnosed Mr. Mullens with FASD. The State did not put on any evidence—whether at sentencing or on postconviction review—that Mr. Mullens does not have FASD. In other words, there is no "difference of expert opinions," neither between Mr. Mullens's trial and postconviction experts nor between Mr. Mullens's and the State's experts. Beyond that, trial counsel *were* aware of the fact that Mr. Mullens's mother regularly drank while pregnant (which should have caused them to investigate the possibility of fetal alcohol spectrum disorder), but it was not until postconviction review Dr. Maher actually examined Mr. Mullens for fetal alcohol spectrum disorder, found physiological and psychological proof that he suffers from fetal alcohol spectrum disorder, and made his FASD diagnosis. No one—not trial counsel, not Ms. Cunningham, not Dr. Machlus—had previously uncovered or considered that evidence, much less made (or ruled out) an FASD diagnosis. Indeed, no one investigated the possibility of fetal alcohol spectrum disorder *at all*. That is precisely what made counsel's performance deficient.

**b. Trial counsel failed to investigate and present evidence that Mr. Mullens suffers from organic brain damage and intellectual disability.**

Trial counsel all recognized that Mr. Mullens exhibited signs of brain damage and intellectual disability. And multiple members of the defense team, from Ms. Cunningham to Dr. Gamache, told counsel that Mr. Mullens might have brain damage. From that, counsel was on notice to investigate further. Yet counsel failed to have a neuropsychologist examine Mr. Mullens and wrongly believed that the psychologist they did hire was qualified to make a neuropsychological diagnosis (he wasn't). The Florida Supreme Court has recognized time and again that mental-state mitigation—especially evidence of intellectual disability and brain damage—are the most weighty forms of mitigating evidence. As such, counsel's failure to adequately investigate Mr. Mullens's intellectual disability and brain damage, despite all the indications and warnings from members of the defense team, undeniably amounts to deficient performance.

*Everyone* on Mr. Mullens's defense team recognized that Mr. Mullens suffered from a serious intellectual disability and possible brain damage. Even Mr. Clapp— notwithstanding his alcoholism and negligence—immediately knew that something wasn't right with Mr. Mullens "just interacting with him." PCR/2739–40. In 2008, when the case came into the office, Mr. Clapp engaged neuropsychologist Dr. Michael Gamache because he suspected something was "definitely wrong" with Mr. Mullens's brain (and because Mr. Clapp wanted to disqualify Dr. Gamache from being called as a witness by the State). PCR/2740;

PCR/2747; PCR/4025–26. Apparently, the trial team did nothing to utilize Dr. Gamache for mitigation or diagnosis until *three years later*, in October 2011 (about 18 months before Mr. Mullens pleaded guilty), when Dr. Gamache first examined Mr. Mullens and told Ms. Menadier that Mr. Mullens may suffer from damage to his frontal lobe. PCR/3050. At the postconviction hearing, Ms. Menadier confessed she had no recollection of this conversation with Dr. Gamache, and that no one ever followed up or ordered more testing. PCR/1464–65. Dr. Gamache did no further work on the case.

Dr. Machlus was eventually hired after Mr. Clapp was fired—only eight weeks before Mr. Mullens's sentencing. PCR/1743. But Dr. Machlus is a psychologist, not a neuropsychologist, like Dr. Gamache. As Dr. Ouaou (a neuropsychologist) testified at the postconviction hearing, neuropsychology is a specialty within the field of clinical psychology that focuses on brain function and its effects on behavior. (PCR/2231–32); *see* Am. Psych. Ass'n, *Clinical Neuropsychology* (2008), https://www.apa.org/ed/graduate/specialize/neuropsychology ("Clinical Neuropsychology is a specialty field within clinical psychology, dedicated to understanding the relationships between brain and behavior, particularly as these relationships can be applied to the diagnosis of brain disorder, assessment of cognitive and behavioral functioning and the design of effective treatment."); Nat'l Acad. of Neuropsychology, *NAN Definition of a Clinical Neuropsychologist* (2001), https://www.nanonline.org/docs/PAIC/PDFs/NANPositionDefNeuro.

pdf ("The clinical neuropsychologist uses psychological, neurological, cognitive, behavioral, and physiological principles, techniques and tests to evaluate patients' neurocognitive, behavioral, and emotional strengths and weaknesses and their relationship to normal and abnormal central nervous system functioning."). Neuropsychologists are trained to administer tests and diagnose medical conditions, including organic brain damage, that psychologists, like Dr. Machlus, are not. As such, Dr. Machlus did not have the training, experience, or formal qualifications to test for—much less diagnose—Mr. Mullens's neuropsychological problems.

Notwithstanding the lack of testing, Mr. Mullens's disability was plain for anyone to see. He showed *countless* signs that should have prompted experienced trial counsel like Ms. Menadier and Mr. Hays to engage a neuropsychologist and to investigate organic brain damage: serial head injuries, sensory-processing problems, school failures, fetal exposure to alcohol and drugs, using drugs and huffing aerosols as a child and teenager, peripheral vision issues, hallucinations, low IQ, memory problems, odd gait, strange and compulsive behavior, disinhibition, inappropriate jocularity, and rapid, pressured speech. *See, e.g.*, PCR/1367–68; PCR/1380–81; PCR/1396–97; PCR/1806; PCR/2265–66; PCR/2279–80; PCR/2993; PCR/3026; PCR/3033; PCR/3122–23. As counsel Mr. Eide put it: "[H]e was not right. ... [Mullens] obviously had some type of mental impairment ... organicity [organic brain damage] or some other type of mental illness or a combination of the two. ... I know he was a substance abuser. That can't

be good for what little brain cells he possessed." PCR/1751. When asked to clarify what he meant by "organicity," he explained that he believed Mr. Mullens had "organic brain damage." *Ibid.* "Dead areas of the brain that aren't functioning right." *Ibid.*

Because Ms. Cunningham was overwhelmingly concerned that Mr. Mullens had not been properly diagnosed, Ms. Cunningham recommended that Dr. Machlus speak with a neuropsychologist and specifically recommended Dr. Ouaou, who testified on Mr. Mullens's behalf at the postconviction hearing. PCR/1391; PCR/3036. Ms. Cunningham's recommendation was not followed. And "after it seemed [to Ms. Cunningham] like Dr. Machlus was not understanding Mr. Mullens' case well, she suggested to counsel to use a different expert or get a second opinion." Op. 20 (PCR/2940). Again, Ms. Cunningham's recommendation was ignored.

The two lead death-qualified trial attorneys on Mr. Mullens's case wrongly believed that Dr. Machlus was qualified to conduct neuropsychological testing. PCR/1499–1500; PCR/1798. Despite the fact that Ms. Menadier had consulted with neuropsychologists and used brain imaging in past cases, and the fact that Dr. Gamache told Ms. Menadier he suspected Mr. Mullens suffered from frontal lobe dysfunction, Ms. Menadier admitted at the evidentiary hearing that she thought Dr. Machlus had administered neurological testing to Ms. Mullens. PCR/1499–1500. He had not. Ms. Menadier later admitted, "going through this process and my file, there's a lot of things I missed and didn't follow-up on them like I should

have." PCR/1501. Ms. Menadier explained that she understood that a history of head injuries indicates a need for a neuropsychiatric work-up and that it had been a "mistake" to not get one. PCR/1473; PCR/1504–05; *see* Op. 20 (PCR/2940). Mr. Hays, likewise, could not explain why no one followed up about getting brain scans such as a PET scan or MRI, noting, "I don't know that there was any reason not to." PCR/1806.

Ms. Miller, the most junior member of Mr. Mullens's defense team, didn't know the difference between a psychologist and a neuropsychologist at the time she worked on Mr. Mullens's defense. PCR/1673. Compounding that confusion, Ms. Menadier had incorrectly told Ms. Miller that Dr. Machlus *was* a neuropsychologist. PCR/1683. Ms. Menadier, of course, should have known better, considering that the word "neuropsychologist" is absent from Dr. Machlus's curriculum vitae and his report, which also makes no mention whatsoever of neurological testing or other examinations typically carried out by a neuropsychologist. R13/2153–92. In Ms. Miller's view, there was simply no reason—strategic or otherwise—not to follow Ms. Cunningham's recommendation that a neuropsychologist should examine Mr. Mullens. PCR/1677. It seems the only reason counsel didn't follow Ms. Cunningham's is that they wrongly believed that Dr. Machlus had already administered neuropsychological testing.

Trial counsel admitted that they knew that brain damage is one of the most important mitigation factors considered by Florida courts. PCR/1799. And counsel had ample funding for experts in capital cases, so there were no financial

constraints on assembling resources for Mr. Mullens's defense. PCR/1456. Yet counsel failed to recognize the signs of intellectual disability and organic brain damage, and they failed to engage a neuropsychologist or anyone else who could properly diagnose those conditions. As a result, the sentencing court was not presented with key evidence of Mr. Mullens's intellectual disability and organic brain damage. "There was simply no presentation as to Mr. Mullens's adaptive deficits during the penalty phase, let alone whether they occurred prior to the age of 18." Op. 12 (PCR/2932). And the "evidence as to the effects of brain damage from repeated trauma" and fetal exposure to alcohol and drugs was likewise "overlooked at the penalty phase." Op. 23 (PCR/2943). Trial counsel admitted there was "no reason" she failed to investigate and present mitigation evidence of head injury and brain damage. PCR/1677.

On postconviction review, the court heard, for the first time, competent, substantial, and *unrebutted* evidence that Mr. Mullens suffers from intellectual disability and organic brain damage. Neuropsychologist Dr. Robert Ouaou testified that he spent ten or eleven hours with Mr. Mullens over three visits to administer a battery of specialized tests to assess brain function. PCR/2252–53. He administered numerous tests of memory, logic, perception, executive function, and intelligence, as well as several embedded and stand-alone measures to evaluate whether Mr. Mullens was malingering. PCR/2255–60; PCR/3314–21; PCR/3479–85. Mr. Mullens passed every test for malingering and gave full effort on all of his testing. PCR/2270; PCR/2361 (no problems with Mullens's symptom validity for

brain damage or intellectual disability). But Mr. Mullens demonstrated significant impairments in executive function, learning, memory, and language functioning. PCR/2271. Mullens was found to have severely impaired executive function, scoring in the first or second percentile. PCR/2273–74. His learning and memory scores on the California Verbal Learning Test and the Wechsler Memory Scale fell below the first percentile. PCR/2276; PCR/3479–85. This pattern of test results indicates organic brain damage in the frontal limbic system and frontal lobe— which is highly relevant to mitigation— because these parts of the brain controls judgement, rationality, social comportment, following rules, reasoning through feelings, and impulse control. PCR/2288–89.

The State did not proffer a neuropsychologist or offer any evidence whatsoever to counter Dr. Ouaou's conclusions relating to the brain damage he had diagnosed Mr. Mullens with through neuropsychological testing. And the postconviction court found "the testimony and evidence as to the effects of brain damage from repeated trauma, ... and the testimony and evidence regarding Mr. Mullens' possible intellectual disability to be *credible and compelling* to a mitigation presentation[,] and[] all were overlooked at the penalty phase." Op. 23 (PCR/2943) (emphasis added).

Counsel was on notice that Mr. Mullens presented numerous warning signs of organic brain damage and intellectual disability. Counsel's failure to investigate those potential disorders (and their failure to hire qualified experts to examine Mr. Mullens for those disorders) was clear deficient performance under the Florida

Supreme Court's and the United States Supreme Court's precedent. This type of mitigation has long been recognized as weighing heavily against a sentence of death by the state courts all the way through the United States Supreme Court.

Mr. Mullens's brain damage and intellectual disability is not "a difference of opinion among experts. Begin with the evidence of Mr. Mullens's brain damage. The State did not dispute that *nobody* examined Mr. Mullens for brain damage before sentencing. The only qualified expert to even consider the possibility, Dr. Gamache, specifically told counsel that Mr. Mullens might have frontal lobe damage—a fact that counsel admitted was sufficient to trigger her duty to investigate further. PCR/1464–65. There was simply no conflicting expert testimony below because there was no investigation, much less any diagnosis one way or the other.

As for Mr. Mullens's intellectual disability, the State was wrong to rely on Dr. Machlus's faulty administration of the WAIS-IV, which Dr. Machlus admitted he had administered in multiple sessions over multiple days, contrary to the test's instructions. R10/1429–30. Intelligence testing is a precise science in which an individual's capabilities are compared to broad norms across the population. PCR/2330–32; PCR/2337; PCR Evidentiary Hearing, Defendant's Ex. 33 (WAIS-IV Manual) (admitted under seal below because the WAIS-IV is proprietary). In order to get valid results, mental health professionals use standardized testing methods, so that comparisons between individuals and the norms are not the result of random, varied testing procedures. *Ibid.* The WAIS-IV's manual stresses

the importance of maintaining standardized test administration. *Ibid.* The manual clearly states that test administrators "should make every effort to administer the core and supplemental subtests ... *in one session.*" WAIS-IV Manual at 28 (emphasis added). Under rare circumstances, the subtests can be administered in *two* sessions, but "[i]f administration ... must be done in two sessions, the second session should occur *as soon as possible.*" *Ibid.* (emphasis added). There is no provision in the WAIS-IV manual for breaking up the IQ subtests into *multiple sessions* over *multiple days. Ibid.*

Breaking up IQ testing by many days produced an invalid, artificially inflated IQ score. PCR/2337. The WAIS-IV is intended to be given in a single one-hour session, yet Dr. Machlus gave the test on dates that were at least a week apart. PCR/2331. As Dr. Ouaou explained, that is like a hockey game in which one team gets line changes and the other does not. PCR/2332). The fatigue factor had an especially strong effect on Mr. Mullens's WAIS-IV scores involving processing speed. His processing-speed scores on Dr. Machlus's test were in the 50th percentile and the 16th percentile; his scores on Dr. Ouaou's were in the 9th percentile and the 5th percentile. PCR/2336. Since the WAIS-IV is normed to account for fatigue, Dr. Machlus's score is outside both medical and legal norms and cannot be used substantively to disprove intellectual disability. PCR/2330–32; PCR/2337; PCR Evidentiary Hearing, Defendant's Ex. 33 at 28 (WAIS-IV Manual).

The manual provides instructions on how to *properly* administer the test to

achieve a valid result, and there is no dispute that Dr. Machlus failed to follow those instructions. Dr. Ouaou's testimony was not a difference of expert opinion on this matter; it was the first time the court ever heard *valid and reliable* testimony regarding Mr. Mullens's IQ. *See* Fla. Admin. Code R. 65G-4.011 ("When a defendant convicted of a capital felony is suspected of having ... intellectual disability ... [t]he test shall consist of an individually administered evaluation, *which is valid and reliable* for the purpose of determining intelligence." (emphasis added)).

Mr. Mullens adduced competent and substantial evidence of brain damage and intellectual disability. As for brain damage, Mr. Mullens presented several different types of evidence proving intellectual disability at the postconviction hearing. First, he presented factual evidence identifying several potential causes of brain damage, namely, that Mr. Mullens's mother drank heavily while pregnant with him and that Mr. Mullens suffered serious and repeated head trauma as a child. Second, he presented expert testimony from Dr. Ouaou and Dr. Maher that Mr. Mullens's neurological testing strongly indicated organic brain damage. And third, he presented expert testimony from Dr. Wu, who testified that Mr. Mullens's brain scans showed "very significant" brain abnormalities consistent with fetal alcohol spectrum disorder, traumatic brain injury, and chronic traumatic encephalopathy (CTE). PCR/1840; PCR Evidentiary Hearing, Defendant's Exs. 21 & 22 (CD-ROMs containing image files of Mr. Mullens's PET and MRI scans); PCR/3401–78.

The State did not put on *any* evidence to rebut the first two evidentiary bases for finding brain damage. Instead, the State proffered the testimony of only one expert, Dr. Holder, who testified that he disagreed with Dr. Wu's conclusion that Mr. Mullens's brain scans showed brain damage. The postconviction court found the experts' testimony on this point to be "conflicting" and therefore "not dispositive." Op. 16 (PCR/2936). But, notably, Dr. Holder conceded that he would "defer to the findings of a qualified neuropsychologist" about the results of "neuropsychological testing." PCR/2679. And he did not dispute Dr. Ouaou's neuropsychological diagnosis that Mr. Mullens suffers from organic brain damage. *See ibid.*

Even discounting the conflicting brain-scan evidence, the postconviction court still found that Mr. Mullens likely suffers from brain damage based on the neuropsychological evidence presented. Op. 23 (PCR/2943). When a postconviction court hears conflicting evidence at a postconviction evidentiary hearing, it is for the postconviction court, not the Florida Supreme Court, to resolve the conflict by weighing the evidence.

In Mr. Mullens's case, the postconviction court held that the evidence weighed in favor of finding organic brain damage, and that decision was supported by two independent evidentiary bases.

As for Mr. Mullens's intellectual disability, not only is the evidence competent and substantial; it went entirely unrebutted below. Mr. Mullens put on evidence establishing that he has an IQ consistent with a diagnosis of intellectual

45

disability. Op. 10–11 (PCR/2930–31). He put on evidence establishing that he has suffered from adaptive deficits. Op. 10–12 (PCR/2930–32). And he put on evidence establishing that he experienced the onset of these symptoms "during the development[al] period," that is, before he turned 18. Op. 11, 24–25 (PCR/2931; PCR/2944–45). That evidence satisfied all three prongs for finding intellectual disability under Florida law.

The State put on no evidence rebutting these facts. Instead, the State attempted only to poke holes in Mr. Mullens's evidence. But its arguments failed. With regard to Mr. Mullens's IQ, the State failed to produce through its own expert an IQ score for Mr. Mullens high enough to discredit Mr. Mullens's intellectual disability. Instead, the State asked the postconviction court to *ignore* Mr. Mullens's one properly administered test, on which he scored a 73, *see* Op. 24 (PCR/2944), and to credit the botched test administered by Dr. Machlus. The postconviction court was obviously right to give greater weight to the properly administered test.

The State put on *no* evidence, whether to bolster Dr. Machlus's faulty test or to suggest that Dr. Ouaou's results are somehow invalid. If the State was so confident that Mr. Mullens's IQ is higher than 73, why didn't it put on its own expert to say so? Why didn't it administer its own IQ test? The State had no answers.

Certain adaptive deficits identified by Mr. Mullens, such as his failure to hold down a job or learn to drive a car, are attributable to his imprisonment at a young age, not intellectual disability. But the State ignores the many other adaptive

46

deficits found by the postconviction court, including that, from an early age, Mr. Mullens "had problems with speech and communication and ... was highly sensitive," that he "did not pick up on social cues and had difficulty initiating or participat[ing] in group activities," and that he "had problems following direction, problems with time management, and ... reading and writing issues." Op. 11 (PCR/2931). None of those deficits are attributable to Mr. Mullens's time in prison, nor did the State dispute that Mr. Mullens suffers from them. Likewise, the State did not dispute that Mr. Mullens's symptoms arose before the age of 18.

Adaptive deficits, like those identified at the postconviction hearing, are qualitatively different from other mental mitigating factors because they describe specific skills that Mr. Mullens lacks and tasks that Mr. Mullens cannot accomplish without assistance. *See* Op. 11 (PCR/2931). Moreover, the ABDS test for adaptive deficits administered by Dr. Ouaou is standardized to avoid subjective labels, like "immature," and draws from numerous sources to minimize confounding factors, such as Mr. Mullens's attempts "to present himself as being normal," not "sick or disabled." PCR/1586. Based on these tests, Mr. Mullens was shown to be not merely "immature, impulsive, and easily manipulated." *See* State Br. 75. He scored in the *first percentile* and demonstrated impairment in *all three* adaptive domains— conceptual, social, and practical. PCR/2344–45.

Mr. Mullens's childhood was marked by extreme poverty, abuse, and neglect— not fastidious recordkeeping. There is no requirement that Mr. Mullens prove his intellectual disability through independent contemporaneous

documentation. Mr. Mullens's self-reports and statements from his family were more than enough to alert counsel to the possibility of brain damage. Add to that counsel's own observations and impressions that Mr. Mullens had possible brain damage, as well as Dr. Gamache's and Ms. Cunningham's recommendations that Mr. Mullens be examined for brain damage, and there can be no question that counsel's failure to investigate amounts to deficient performance.

Ms. Menadier's sparse notes of one conversation with Dr. Gamache (that she did not even remember) do not specifically note that Dr. Gamache recommended brain scans. But Dr. Gamache did tell counsel that he suspected Mr. Mullens suffered from frontal lobe dysfunction or disorder—a fact that Ms. Menadier emphasized with an asterisk in her notes. PCR/1464; PCR/3050. That alone was enough to put counsel on notice to investigate further. Indeed, Ms. Menadier admitted that her next step should have been to order a "neuropsych workup." PCR/1465. But she did not, and Dr. Gamache never even produced a written report. *Ibid.* The State also asserted that "Dr. Gamache was more concerned about the existence of personality disorder causing Mullens's outrageous behavior." But that doesn't mean he had ruled out frontal lobe dysfunction. In fact, the evidence shows the opposite. *See* PCR/1464; PCR/3050.

The postconviction court properly relied on Ms. Cunningham's "fact sheet," a report she prepared that "condensed the most serious and pertinent information about Mr. Mullens and his case." Ms. Cunningham's fact sheet "noted *multiple head injuries* plus *neurological issues*, and *severe trauma* and *active psychosis*"

and "specified a *low IQ score* in elementary school and a history of having an extremely *poor short-term memory* and *possible brain damage.*" *Ibid.* (emphasis added) (quoting Op. 20 (PCR/2940)); *see also* PCR/3034–35 (fact sheet). Ms. Cunningham's fact sheet may not have constituted substantial evidence in itself, but that it was sufficient to put counsel on notice to investigate further. That failure to investigate constituted deficient performance.

### c. Trial counsel failed to adequately develop evidence that Mr. Mullens was repeatedly sexually abused and raped as a child and as an adult in prison.

Trial counsel knew that Mr. Mullens had been repeatedly sexually abused and raped, both as a child at the hands of his stepfather and as an adult in prison. Yet they failed to substantiate these facts with available evidence at the sentencing phase. As such, the trial court "found no competent, substantial evidence supported" this mitigating factor and gave it no weight. Op. 10 (PCR/2930); R11/1604. This too was deficient performance.

Mr. Mullens's childhood sexual abuse was discovered and disclosed to trial counsel as early as 2011 and was documented in Ms. Cunningham's numerous mitigation reports. *See, e.g.*, PCR/2992–93; PCR/3034–35. Ms. Cunningham informed counsel that, in addition to the incidents he had disclosed to her, Mr. Mullens had also "alluded to other incidents of sexual abuse as well as something that might resemble a prison rape." PCR/2992. There was ample credible evidence available to trial counsel that Mr. Mullens had been sexually abused more than a dozen times by his stepfather. PCR/2991–92. Nonetheless, "the only evidence

presented on this issue was speculation by family members and the testimony of Dr. Machlus who testified that Mr. Mullens reported that he was sexually abused by his stepfather as a child and on eight occasions while incarcerated." Op. 10 (PCR/2930). Yet Dr. Machlus also testified that Mr. Mullens might be malingering. *Ibid.* The trial court thus "found no competent, substantial evidence supported the non-statutory mitigating circumstance that Mr. Mullens was sexually abused as a child and as an adult in prison." *Ibid.*; *see* R11/1604 ("[T]he Court finds that this non-statutory mitigator has not been proven and therefore accords it no weight.").

On postconviction review, the court heard credible and compelling evidence corroborating Mr. Mullens's reports that he was repeatedly sexually abused. Op. 9 (PCR/2929). Dr. Maher "testified that Mr. Mullens detailed the sexual abuse incidents and did not find Mr. Mullens to be malingering." Op. 10 (PCR/2930). "Likewise, Dr. Ouaou performed a multitude of tests with Mr. Mullens and found him not to be malingering." *Ibid.* Dr. Maher explained that when Mr. Mullens compulsively masturbated (or mimicked masturbating) while describing his sexual abuse, those involuntary movements were a "primitive, programmed, repetitive motor activity which is seen in a lot of severe brain conditions where people get stuck on something ... when they're particularly stressed from that memory, experience, or trauma." PCR/2144–45. Dr. Maher testified that this impulsive, involuntary behavior "rings very true in terms of authenticating this as a real and genuine memory experience that Khadafy [Mullens] had." PCR/2145. In other words, Dr. Maher's testimony corroborated Mr. Mullens's own reports that he had

been repeatedly sexually abused and rebutted any suggestion that Mr. Mullens might be malingering. On postconviction review, Judge Federico concluded that, had this evidence been presented at sentencing, he "would have found this mitigation factor to have existed." Op. 10 (PCR/2930).

Here, counsel knew that Mr. Mullens had been repeatedly raped as a child and as an adult, and they knew that this fact was an important mitigating factor. *See* PCR/1695. Yet they failed to uncover and present competent, substantial evidence to support such a finding. Op. 10 (PCR/2930). Rather, counsel put on testimony from someone who—despite all evidence to the contrary—thought Mr. Mullens might not be telling the truth and who failed to connect his compulsive sexual behavior to his trauma. *Ibid.* This was not a strategic decision or based on a determination that Mr. Mullens was malingering. To the contrary, counsel believed Mr. Mullens was telling the truth about his sexual abuse and knew that this evidence was crucial to the mitigation presentation. *See* PCR/1658; PCR/1695.

Dr. Maher found that Mr. Mullens had been sexually abused "because of Mullens's hesitance and humiliation while speaking about [his abuse] and 'in light of Mr. Mullens' primitive, programmed, repetitive motor activity of masturbation while describing the sexual abuse to Dr. Ouaou.'" *Ibid.* (quoting Op. 17 (PCR/2937)).

Beyond that, Mr. Mullens's aunt testified that she believed he had been sexually abused by McClendon. Op. 10 (PCR/2930); *see* R8/1215–24; R8/1285–89. As trial counsel explained, "at least one family member ... always suspected

that his stepfather ... had been molesting him, but obviously nobody saw that because people molest in private, not in public." PCR/1548. The new evidence adduced on postconviction review corroborated and substantiated Mr. Mullens's family's suspicions.

On appeal to the Florida Supreme Court, the State cited instances where examiners believed Mr. Mullens was malingering. *See* State Br. 68. But none of those citations—not one—refers to an instance where anyone thought Mr. Mullens was lying about his childhood sexual abuse. To the contrary, the record is replete with observations by Mr. Mullens's defense team and other medical professionals documenting that Mr. Mullens had been raped as a child and as an adult. *See, e.g.*, PCR/998; PCR/2992.

Based on the new evidence presented at the postconviction hearing, the trial court determined that Mr. Mullens had been "sexually abused as a child and as an adult in prison." Op. 10 (PCR/2930). Unlike the uncorroborated and speculative testimony presented at Mr. Mullens's sentencing, the new evidence provided a competent and substantial basis for the postconviction court to determine that Mr. Mullens had, in fact, been sexually abused. It explained Mr. Mullens's compulsive behavior; it explained why he had told so few people about his abuse; and it dispelled any suggestion that Mr. Mullens could be malingering. The postconviction court was correct in finding that counsel's failure to develop and present that evidence at sentencing was deficient performance. Op. 10, 22–23 (PCR/2930; PCR/2942–43).

No one thought Mr. Mullens was lying about his childhood sexual abuse. To the contrary, the record is replete with observations by Mr. Mullens's defense team and other medical professionals documenting that Mr. Mullens had been raped as a child and as an adult. *See, e.g.*, PCR/998; PCR/2992. And the only experts to expressly consider the veracity of Mr. Mullens's childhood sexual abuse expressly concluded that Mr. Mullens was telling the truth, as corroborated by his hesitancy and humiliation in speaking about the abuse and his compulsive sexual behavior when describing it. *See* PCR/2937.

This is not merely a difference of expert opinion. This is not a case where experts have come to opposite conclusions based on the same evidence. At sentencing, Dr. Machlus simply did not consider whether Mr. Mullens's hesitancy and humiliation while discussing his childhood abuse or his compulsive sexual behavior corroborated Mr. Mullens's self-reports of abuse. Dr. Machlus certainly did not rule out such a conclusion or come to an inconsistent interpretation of the evidence. Dr. Machlus did not consider whether that behavior was also evidence of childhood sexual abuse. It was not until postconviction proceedings that Dr. Maher first considered the evidence and rendered an opinion on its significance with regard to Mr. Mullens's sexual abuse.

### d. Trial counsel failed to investigate and present evidence that Mr. Mullens suffers from PTSD.

Counsel knew Mr. Mullens had all of the tell-tale signs of PTSD yet failed to investigate further or present any evidence of PTSD at sentencing.

Ms. Cunningham discovered and disclosed several bases for a diagnosis of PTSD, including Mr. Mullens's experiences of childhood physical and sexual abuse, neighborhood violence, and prison rape. PCR/2992–97. Ms. Cunningham found Mr. Mullens had *all* of the classic symptoms of PTSD including flashbacks, nightmares, hypervigilance, and an abnormally high startle response. PCR/1369–70; PCR/1477; PCR/2995–97. As reported in Ms. Cunningham's notes: "After his stint at Florida State Prison, Khadafy [Mullens] came home a 'different person.'" PCR/3035. His PTSD symptoms were confirmed by his family, who told Ms. Cunningham that "Khadafy would scream and cry whenever they tried to wake him up from sleep, as if someone were brutalizing him." PCR/3035; *see also* PCR/1369–71; PCR/2997. Based on this evidence, Ms. Cunningham diagnosed Mr. Mullens with PTSD, (PCR/359; PCR/590; PCR/1394), and Ms. Cunningham and Ms. Menadier recommended follow-up tests for PTSD to Dr. Machlus and the trial team. PCR/1493; PCR/3025; PCR/3060–61. But Dr. Machlus was dismissive of the issue. PCR/1696. PTSD was not mentioned even once in Dr. Machlus's final report.

PTSD inexplicably seemed to have fallen off trial counsel's radar entirely. Counsel failed to include any testimony about or evidence of PTSD in the mitigation hearing or in the sentencing memoranda—for no reason. On postconviction review, lead trial counsel admitted there was no strategy in failing to investigate and present evidence of Mr. Mullens's PTSD at sentencing, (PCR/1496) and that it was a "mistake[]" not to. PCR/1501; PCR/1504–05. In fact,

counsel "all felt like Khadafy [Mullens] had PTSD," PCR/1695, and they were well aware that PTSD can be effectively used in mitigation. *ibid.*; PCR/1723; PCR/1779–80. Nobody could explain why they didn't present any evidence of PTSD.

The postconviction court heard competent and substantial evidence that Mr. Mullens in fact suffers from PTSD. "Dr. Maher testified that he opines Mr. Mullens to have PTSD based on Mr. Mullens' background of specific trauma and sexual abuse at the hand of his stepfather and on the broader conditions of neglect and disregard." Op. 17 (PCR/2937). Dr. Maher testified that Mr. Mullens is "confused, humiliated, [and] ashamed" of having been raped, and that PTSD is "pretty standard fare with people who have sexual trauma in childhood, and it's horrible and tragic and relevant to their lives." PCR/2140. Dr. Maher testified that PTSD produces symptoms that he identified in Mr. Mullens, including "impulsivity, anxiety, lack of ability to plan ahead, lack of appreciation for other people's well-being, ... a feeling of self-centeredness[,] ... school failure, [and] unjustified or exaggerated emotional rage." Op. 17 (PCR/2937). Dr. Maher explained that PTSD is "extremely important" to Mr. Mullens's psychological diagnosis. PCR/2146. Based on this evidence, the postconviction court found that "Dr. Maher's testimony regarding Mr. Mullens' PTSD appears *credible and significant* in considering the appropriate sentence for Mr. Mullens." Op. 17 (PCR/2937) (emphasis added). Judge Federico thus concluded that, if he had "received evidence regarding Mr. Mullens' diagnos[i]s of PTSD ... and the implications of such diagnos[i]s, ... [he] would have found that the balance of the aggravating and mitigating factors did

not warrant death." Op. 23 (PCR/2943).

Counsel believed that Mr. Mullens suffered from PTSD yet failed to investigate further or present any evidence of Mr. Mullens's PTSD at sentencing. That failure amounted to deficient performance. Counsel has a duty to investigate and present evidence of mental-health issues generally and PTSD in particular. and that such evidence may require expert analysis to be uncovered and developed.

### e. Trial counsel failed to explain how Mr. Mullens's mental-health problems effected his mental state at the time of the crime.

Counsel not only failed to investigate and present numerous forms of mitigating evidence. They also failed explain the effect of Mr. Mullens's mental-health problems on his decision making (or lack thereof) at the time of the crime. That failure independently amounts to deficient performance.

The sentencing court gave great weight to aggravating facts contemporaneous with the crime, including Mr. Mullens's attempt to flee and avoid arrest. R15/2296–2302. But, on the other side of the ledger, the court gave less weight to the influence of extreme mental or emotional disturbance and diminished capacity. R15/2305–09. The court explained that it gave these factors less weight because counsel failed to link Mr. Mullens's mental or emotional disturbance to Mr. Mullens's decision making at the time of the crime.

Dr. Machlus was unable to directly link Mr. Mullens's mental or emotional disturbance to Mr. Mullens's willful decision to commit murder and attempted murder. While Dr. Machlus testified that Mr. Mullens's Bipolar symptoms could

wax and wane from mild to severe, he could not pinpoint where in the spectrum Mr. Mullens's Bipolar symptoms were manifesting themselves at the time of the murders.

Dr. Machlus never inquired of Mr. Mullens as to his mental state at the time of the murders. This lack of specificity leaves the courts in a position to have to speculate as to Mr. Mullens's condition and mental state when he murdered Mr. Uddin and Mr. Hayworth and attempted to murder Mr. Barton.

On postconviction review, the court finally saw the full picture. Not only did postconviction counsel present *all* of the mitigating evidence (including the evidence of fetal alcohol spectrum disorder, intellectual disability and organic brain damage, sexual abuse, and PTSD that trial counsel had failed to investigate or present at sentencing); counsel used that evidence to explain Mr. Mullens's mental state at the time of the crime, providing the "specificity" that the court had found absent at sentencing. Postconviction counsel explained that on August 11, 2008, *six days* before the crime, Mr. Mullens's stepfather— "the man who had repeatedly fondled, fingered, and forced him into homosexual various sex acts as a child"—was killed suddenly in a train accident. PCR/2799. Mr. Mullens's family members were shocked by his mother's insistence that he attend the funeral. *See, e.g.*, PCR/3017 ("Sandy should never have tried to take Khadafy [Mullens] to Levi's funeral … that is ridiculous. She was just in denial. She knew Khadafy was being sexually abused by Levi. He was a total perv." (alteration in original)). Mr. Mullens's mother told him that he was expected to attend the funeral of his

childhood rapist on Monday, August 18, 2008. *Ibid.*

Postconviction counsel explained that on the day of the crime—*the day before* the funeral—Mr. Mullens was extremely mentally unstable due to his trauma, his intellectual disability, and his lack of impulse control, which was compounded by heavy drug and alcohol use that day. *Ibid.*; PCR/2822. It was then—when Mr. Mullens was at his most vulnerable—that Spencer Peeples convinced Mr. Mullens to help him rob the convenience store. PCR/2834. Trial counsel seemed to make the connection between Mr. Mullens's mother compelling him to attend the funeral of his rapist and the timing of the crime. *See* PCR/3039 ("Interestingly, Mr. McClendon was killed in a train accident on August 11, 2008, just a few days before the homicides. Mr. McClendon's funeral was held on August 18, 2008, the day after the homicides and Mr. Mullens was expected by his family to attend the funeral."). But this connection was not explained to the sentencing court. Mr. Mullens's sentencing judge was not presented with this important context until postconviction review. But once he knew the whole story, he concluded that, "[h]ad a more cohesive presentation of Mr. Mullens' mitigation evidence been presented," he would not have sentenced him to death. Op. 23 (PCR/2943).

It is not enough for counsel to present a laundry list of mitigation factors; those facts must be explained in relation to the circumstances of the crime, if possible. When there is a relation to the crime mitigation is extremely compelling. The ABA Guidelines embody prevailing professional norms that counsel must

follow, advise that "it is critically important to construct a persuasive narrative [of mitigation], rather than to simply present a catalog of seemingly unrelated mitigating factors." Crafting a compelling mitigation narrative is a critical part of defending a death penalty case. Perhaps most importantly, counsel should connect the mitigating evidence to the circumstances of the crime and the effect of the mitigating evidence on the defendant's mental state. Otherwise, as the sentencing court found here, the mitigation presentation will lack the "specificity" necessary for the court to determine whether the evidence lessens the defendant's culpability. R15/2307.

The caselaw confirms that counsel's failure to construct a cohesive mitigation narrative constitutes deficient performance. Here, counsel not only failed to investigate important mitigating evidence; they failed to connect what little evidence they had uncovered to Mr. Mullens's mental state at the time of the crime. It was deficient performance for counsel to leave the court to speculate why the mitigation evidence mattered and how it affected Mr. Mullens's culpability.

### f. Trial counsel failed to adequately supervise Dr. Machlus's incompetent and unqualified performance.

Defense counsel failed to recognize and prevent Dr. Machlus's incompetence and its disastrous effects on the mitigation phase of sentencing. Dr. Machlus failed to identify Mr. Mullens's organic brain damage, failed to administer psychological tests according to professional standards, made errors in scoring tests, performed repeated personality testing to diagnose antisocial personality disorder (ASPD),

and failed to diagnose PTSD due to repeated childhood physical and sexual abuse. Counsel failed to recognize these errors, despite ample evidence and repeated pleas from members of the defense team. And the result was that counsel's mitigation presentation completely backfired. The postconviction court therefore correctly "f[ound] ... counsel's use of Dr. Machlus as their sole expert as well as their management of Dr. Machlus to be deficient." Op. 9 (PCR/2929).

In a typical capital case, defense counsel will engage a whole team of experts in different fields—neuropsychologists, psychiatrists (medical doctors), brain scan experts, trauma experts, *etc.* But trial counsel engaged only Dr. Scot Machlus, a psychologist. Dr. Machlus was the only mental health expert on Mr. Mullens's defense team and the only expert witness the defense called during sentencing proceedings. Dr. Machlus was not trained in neuropsychology, was not a medical doctor, and could not interpret brain scans. He had no prior capital experience. PCR/1469–70.

After Mr. Clapp was fired for drinking on the job, Mr. Eide realized he had only *eight weeks* to find, hire, and prepare a psychological expert for trial. PCR/1743. Mr. Eide testified that he usually hired experts the day he was assigned a case, and he could think of no strategic reason for delay: "I can't conceive of any situation where that [delay] would be useful, unless you were looking for an ineffective assistance of counsel." PCR/1743–44. Most experienced capital experts are booked years in advance, but Dr. Machlus was available on short notice. PCR/1743–44. So, despite his patent inadequacy, Dr. Machlus was hired.

It is a basic rule of psychological evaluation that a practitioner must eliminate the possibility of basic organic brain dysfunction before identifying the cause of a problem as psychological. PCR/2132–33; PCR/2289–90; DSM-5 at xlii (explaining critical nature of state-of-the-art diagnosis of organic brain diseases in conjunction with psychology). The evaluator must rule out medical causes before they can make an accurate psychological diagnosis. PCR/2132–33; PCR/2263–65; PCR/2173–74; PCR/2289–90. But Dr. Machlus lacked the relevant qualifications and expertise to do so.

Ms. Cunningham shared details of serial head injuries, trauma, and abuse with Dr. Machlus and the trial team during meetings. PCR/1468–69; PCR/2991–3035. Medical literature has long recognized the link between drug use, abuse, trauma, and damage to the limbic frontal system, including the frontal lobes of the brain. PCR/2115; PCR/2291. Ms. Cunningham repeatedly suggested that a neuropsychologist be engaged to evaluate brain damage and the necessity of brain scans. PCR/3026. But, as the postconviction court noted, "Dr. Machlus apparently ignored the assessments and suggestions of the mitigation specialist [Ms. Cunningham]." Op. 9 (PCR/2929). Dr. Machlus was also informed that Cassandra Washington drank while she was pregnant with Mr. Mullens. PCR/1686–87. Beyond that, Mr. Mullens's low test scores, history of huffing aerosols as a child, repeated head trauma, and disinhibition are all telltale causes or symptoms of possible brain damage. PCR/2265–68; R13/2166; R13/2168–71. But Dr. Machlus never referred Mr. Mullens for a neuropsychological workup, nor did he flag these

issues for counsel.

Ms. Cunningham also informed Ms. Menadier and Dr. Machlus of Mr. Mullens's years of sexual abuse at the hands of his stepfather. PCR/1468–69; PCR/2991–92. But, as the postconviction court noted, the defense team "failed to adequately convey the mitigation factor that Mr. Mullens was sexually abused" to the sentencing court, which caused the court to give that mitigating factor no weight. Op. 9 (PCR/2929).

Dr. Machlus chose to give Mr. Mullens a common test of cognition, the Woodcock-Johnson Test of Cognitive Abilities (WCJ-COG), and an IQ test called the Wechsler Adult Intelligence Scale IV (WAIS-IV). R13/2164. Mr. Mullens's scores on the WCJ-COG revealed severe cognitive deficits, with thinking ability grade equivalent of 3.6 and delayed recall grade equivalent of 1.6. R13/2169–70. Raw data obtained from Dr. Machlus' administration of the WAIS-IV demonstrated that Mr. Mullens's lowest subtest scores involved tests of working memory. R13/2168. Deficits in working memory and delayed recall are well-known indicators of the presence of organic brain damage. PCR/2267–68; PCR/2271; PCR/2288–89. Dr. Machlus knew Mr. Mullens had the delayed recall ability of a first grader, but he never followed up on Ms. Cunningham's repeated plea that he consult with a neuropsychologist or investigate brain scans. *See, e.g.*, PCR/3036. This error was compounded when Ms. Menadier failed to disclose that she had consulted with neuropsychologist Dr. Gamache in 2011 and that he had told her that he suspected "frontal lobe dysfunction." PCR/3050.

Dr. Machlus made two critical errors in administering and scoring Mr. Mullens's WAIS-IV. First, as described above, Dr. Machlus administered the exam over multiple sessions and multiple days, contrary to the WAIS-IV's instructions. *See supra* Ground IV(1)(b). And, second, Dr. Machlus improperly scored the similarities subtest in the WAIS-IV. Op. 11 (PCR/2931); PCR/2327–29. Because of that scoring error, Dr. Machlus reported Mr. Mullens to be in the 25th percentile rather than the 9th percentile of the population. PCR/2834. Aside from artificially inflating Dr. Machlus's assessment of Mr. Mullens's IQ, the error may also have obscured a basic indication of frontal lobe damage that any competent psychologist would have recognized. In addition, Dr. Machlus's failure to administer a valid IQ test prevented counsel from investigating an intellectual disability claim, which would have provided a categorical bar to Mr. Mullens's death sentence. Both Ms. Menadier and Ms. Miller testified that they were shocked by how high Mr. Mullens's test results were, but no one thought to doublecheck their accuracy. PCR/1519; PCR/1667. Nor did they follow Ms. Cunningham's advice that they should "get a second opinion." Op. 20 (PCR/2940).

Aside from failing to recognize the botched IQ test, trial counsel was also ineffective for permitting Dr. Machlus to repeatedly administer personality testing to Mr. Mullens. Dr. Machlus administered the Personality Assessment Inventory to Mr. Mullens *three times*, on October 14, 2011; January 15, 2013; and January 31, 2013. R13/2171. Likewise, he administered the MMPI-2RF, another basic personality test, on December 21, 2012. R13/2170. Based on this repeated and

unnecessary testing, Dr. Machlus concluded that Mr. Mullens suffers from antisocial personality disorder ("ASPD").

The medical community and defense bar have long recognized that testimony about antisocial personality disorder has "enormous" prejudicial consequences. Courts have recognized that antisocial personality disorder can be *aggravating*, not mitigating, evidence.

On postconviction review, both Dr. Maher and Dr. Ouaou testified that Mr. Mullens had been misdiagnosed with antisocial personality disorder:

> Dr. Maher does not believe that Mr. Mullens has a diagnosis of antisocial personality disorder ('ASPD'), and indeed, opined that features of Mr. Mullens' personality argued against such a diagnosis, such as the presence of genuine relationships and concern and empathy for others. ... Dr. Maher administered the Hare Psychopathy Checklist test to Mr. Mullens, which is a checklist for ASPD. The results demonstrated that Mr. Mullens is significantly less antisocial than the average of male prison inmates. Dr. Maher further found that Mr. Mullens' underlying biological foundational impairments preclude a diagnosis of ASPD. Dr. Ouaou agreed that a diagnosis of ASPD was wrong in this case.

Op. 19 (PCR/2939)

Defense counsel recognized the risks of personality testing and an ASPD diagnosis. PCR/1799. And counsel recognized that personality testing served no strategic or mitigating purpose in Mr. Mullens's case. *See ibid.* Nevertheless, counsel permitted Dr. Machlus to repeatedly administer multiple personality tests. Those tests were the subject of extensive cross-examination by the State at trial, permitting the State to cast Mr. Mullens as sociopathic and irredeemable. R10/1437–56. That never would have happened if Dr. Machlus and defense

counsel had followed prevailing professional norms in capital cases and refused to perform personality testing.

Although Dr. Machlus read Mr. Mullens's medical and psychological records, he reported to the trial team that he found "nothing indicating neuropsych problems" and "no hx [history] of head injury" on January 11, 2013. PCR/3062. Counsel knew that to be false, based on substantial evidence that Mr. Mullens had suffered countless head injuries as a child—not to mention the fact that an *actual* neuropsychologist, Dr. Gamache, had indeed identified neuropsychological issues and potential brain damage. Yet counsel failed to correct Dr. Machlus's false impression, failed to provide him with the relevant materials necessary for him to make a correct diagnosis, and failed to engage an expert qualified to conduct a neuropsychological evaluation.

There was significant evidence presented at the hearing that Dr. Machlus was not a qualified expert. First, even if Dr. Machlus were a qualified mental health expert in some abstract sense, that does not mean that he was qualified to administer the tests and examinations necessary in Mr. Mullens's case. Dr. Machlus was not a neuropsychologist; he could not interpret brain scans; and he was not able to diagnose neuropsychological disorders—crucial mitigating evidence in Mr. Mullens's case. Second, counsel wrongly believed that Dr. Machlus was a neuropsychologist and that he had performed a neuropsychological examination. Both of those beliefs were not only false but baseless, so counsel's reliance on Dr. Machlus's "expertise" was in no way reasonable.

There was poor communication between the defense team that amounted to ineffective assistance. Just take the most egregious instances of miscommunication and failure to supervise. Early on in the case, Dr. Gamache told Ms. Menadier that Mr. Mullens could have brain damage, but Ms. Menadier seems to have forgotten about this conversation and did not tell anyone else on the team, much less Mr. Mullens's one expert witness. Next, although counsel knew that Mr. Mullens's mother drank heavily during pregnancy, nobody followed up with Dr. Machlus to have Mr. Mullens examined for fetal alcohol spectrum disorder. Next, although counsel knew that Mr. Mullens had suffered repeated head trauma as a child, nobody corrected Dr. Machlus's false impression that Mr. Mullens had never suffered head trauma. Next, although counsel knew (or should have known) that Dr. Machlus was not a neuropsychologist and was not qualified to diagnose brain disorders or organic brain damage, counsel did not hire a qualified expert and in fact wrongly believed (without any basis) that Dr. Machlus had administered the appropriate tests. Next, although counsel knew that Mr. Mullens had serious mental problems and a history of low IQ scores, they did not check Dr. Machlus's work when he returned a test result that was far higher than anyone thought was reasonable. Next, although counsel knew that personality testing served no strategic or mitigation-related purpose, they did not stop Dr. Machlus from repeatedly administering personality tests and misdiagnosing Mr. Mullens with a stigmatizing diagnosis of antisocial personality disorder. All of these errors amounted to a shocking level of miscommunication, dysfunction, and lack of

supervision and contributed to counsel's deficient performance.

### g. Trial counsel's deficient performance cannot be ascribed to any strategic decision.

Counsel's ineffectiveness cannot be ascribed to any strategic decision. As trial counsel testified—no less than *four times*—the only explanation for their many missteps was that they "did a bad job." PCR/1654; PCR/1687; PCR/1698. As to fetal alcohol spectrum disorder, counsel simply overlooked the evidence and failed to follow up. As to intellectual disability and brain damage, counsel failed to engage a qualified expert to examine Mr. Mullens. As to sexual abuse, counsel failed to present competent evidence that Mr. Mullens was repeatedly raped as a child and in prison. And as to PTSD, counsel knew Mr. Mullens had all the symptoms fitting a diagnosis but did not present that evidence at sentencing.

Trial counsel advised Mr. Mullens to waive his right to a trial and a sentencing jury and to throw himself at the mercy of the court. But then they failed to follow obvious leads, failed to uncover voluminous and readily available evidence, and failed to explain all of the mitigating evidence in way that would have justified the court's mercy. Those failures were not tactical choices; they were deficient performance.

### h. Trial counsel's numerous errors cumulatively deprived Mr. Mullens of his right to effective assistance of counsel.

Even if the Court is not persuaded that any one of the foregoing failures and mistakes amounts to deficient performance of counsel, the Court must consider

the cumulative effect of *all* of counsel's errors. Counsel's cumulative errors in investigating and presenting mitigation evidence deprived Mr. Mullens of adequate representation at the sentencing proceeding and therefore collectively amount to deficient performance.

### i. The Postconviction Court Correctly Determined That Trial Counsel's Deficient Performance Prejudiced Mr. Mullens.

Counsel's performance was not merely deficient; it also prejudiced Mr. Mullens. Mr. Mullens's postconviction claims were reviewed by the same judge who rendered his death sentence. That judge weighed the mitigating and aggravating evidence presented at sentencing, and he *reweighed* that evidence together with all of the new mitigating evidence adduced on postconviction review. Based on his deep knowledge of Mr. Mullens's case and the record, his first-hand experience of trial counsel's performance at sentencing, and his careful weighing and reweighing of all the mitigating and aggravating evidence, Mr. Mullens's sentencing judge determined that, had he been presented with all of the mitigating evidence at sentencing, he would not have sentenced Mr. Mullens to death. Such a determination definitively demonstrates that trial counsel's deficient performance prejudiced Mr. Mullens. And it undermines any confidence that this Court or the public can have in Mr. Mullens's death sentence.

Even putting aside the sentencing judge's pronouncement that his prior sentence was wrong, it is also, objectively, reasonably likely that the outcome of Mr. Mullens's sentencing proceedings would have been different had counsel

performed adequately. Mr. Mullens adduced on postconviction review strong evidence that he suffers intellectual disability, organic brain damage, fetal alcohol spectrum disorder, and PTSD related to childhood sexual and physical abuse and assaults in prison. And postconviction counsel explained—for the first time—how Mr. Mullens's trauma and mental health problems affected his decisionmaking (or lack thereof) on the day before his childhood rapist's funeral. That new mitigating evidence fundamentally changed the balance between mitigation and aggravation, rendering it reasonably likely that he would have been sentenced to life in prison, rather than death.

### j. Mr. Mullens's sentencing judge would not have sentenced Mr. Mullens to death had he known all of the facts.

This is the rare case where the Court knows for certain that, but for counsel's deficient performance, the sentencer would not have sentenced him to death. Because Mr. Mullens waived his right to a sentencing-phase jury, the trial judge found the mitigating and aggravating facts, weighed the mitigating and aggravating evidence, and rendered his sentence. The same judge then heard all of the new evidence adduced on postconviction review and, after reweighing the evidence, found that, if he had known all of the facts, he "would have concluded that the balance of aggravating and mitigating circumstances *did not warrant death.*" Op. 9 (PCR/2929) (emphasis added).

Executing a man based on a death sentence that the sentencing judge has subsequently declared to be both wrong on the merits and based on

unconstitutional error would profoundly undermine the public's confidence in our justice system.

### k. The new mitigating evidence fundamentally changes the balance of mitigating and aggravating evidence.

Putting aside that we know, for a fact, that Mr. Mullens's actual sentencing judge would not have sentenced Mr. Mullens to death had trial counsel presented all available mitigating evidence, Op. 9 (PCR/2929), it is also, objectively, reasonably probable that the outcome of Mr. Mullens's sentencing proceedings would have been different had counsel performed adequately. Counsel's failures at sentencing were egregious and enormously consequential. Counsel failed to uncover evidence that Mr. Mullens suffers permanent brain damage caused by his mother's substance abuse while pregnant and by repeated head trauma. Counsel failed to engage an expert qualified to diagnose Mr. Mullens's intellectual disability and incapacity. Counsel failed to present evidence corroborating Mr. Mullens's childhood sexual abuse at the hands of his stepfather. Counsel failed to present any evidence that Mr. Mullens suffers from PTSD. And counsel failed to explain how these various mitigating factors affected Mr. Mullens's mental state at the time of the crime—which occurred the day before he was supposed to attend his childhood rapist's funeral. These facts, taken together and separately, fundamentally alter the balance of mitigating and aggravating evidence and thus require a new sentencing.

"There was no evidence of Mullens's precise mental state during the murders because Dr. Machlus did not ask Mullens about his mental state at that time,"

Counsel failed to put on any evidence that Mr. Mullens suffers from organic brain damage, intellectual disability, and fetal alcohol spectrum disorder. And, although counsel did refer to Mr. Mullens's childhood sexual abuse, they failed to introduce competent evidence to substantiate that factor, so the court disregarded it. Op. 10 (PCR/2930). Counsel also failed to introduce evidence of PTSD. Op. 16 (PCR/2936). These missing mitigating factors are compelling. There is a reasonable probability that Mr. Mullens would not have been sentenced to death had counsel presented all of the mitigating evidence.

Trial counsel below was ineffective for failing to zealously prepare, investigate, and present a cogent theory of mitigating evidence. Counsel failed to order a neuropsychological evaluation and brain imaging, hired an incompetent psychologist who presented an incomplete analysis of psychological dysfunction, failed to investigate and present mitigating evidence of psychological trauma, prenatal toxic exposures, rape, physical abuse, intellectual disability, and serial head injuries. This Court should find these deficiencies prejudicial here.

The Florida Supreme Court held that counsel was not ineffective. The court found that there was no deficient performance for failing to present sexual abuse based on the testimony of Mr. Mullens's postconviction experts.  The court found no deficient performance for failing to present PTSD, Possible Intellectual Disability, FASD and Traumatic Brain Damage because Dr. Machlus "was a qualified expert upon whom counsel was entitled to rely in tailoring a penalty-phase strategy. . . [a]nd, although Dr. Ouaou questioned the validity of the IQ test,

the record does not demonstrate that trial counsel had an objective basis for questioning the validity of Dr. Machlus's test administration." Regarding the FASD and brain damage, "Counsel was entitled to rely on their assessments in developing its mitigation strategy and cannot be deemed deficient for not requesting additional testing." The Court stated:

> We have not overlooked (1) Mullens's lead attorney's testimony that she was somewhat confused as to Dr. Machlus's background, (2) a note indicating that Dr. Gamache thought that Mullens might have frontal lobe impairment, (3) an unexplained attorney note suggesting that Mullens did not have a history of head trauma, and (4) the retained mitigation specialist's testimony expressing disagreement with some of Dr. Machlus's views on mitigation. Quite simply, none of this evidence undermines the unrebutted evidence that Dr. Machlus and Dr. Gamache were qualified competent experts on whom counsel was entitled to rely in investigating and presenting mitigating evidence. Nor, in our view, is that evidence sufficient to render such reliance unreasonable.

The majority opinion, except for finding the lower court's findings speculative in part, did not question the lower court's fact-finding.

> Instead, [the court] concluded that the court legally erred when it determined that Mullens had demonstrated deficient performance—an error stemming from its failure to recognize the significance of the undisputed fact that trial counsel hired qualified experts to assist in developing the mitigation strategy and that counsel relied on those experts. To this point, nowhere in its order did the postconviction court acknowledge the principle that counsel is entitled to rely on qualified experts in developing and presenting mitigating evidence—a principle firmly embedded in our case law.

The Florida Supreme Court also found that there was no deficiency for failing to adequately supervise Dr. Machlus, finding that trial counsel could rely on Dr. Machlus. Lastly, the court found that trial counsel's chosen narrative comports

with objective standards of reasonableness.

The court concluded that, "[i]n sum, because Mullens did not meet his burden to show that counsel's investigation and presentation of mitigating evidence was outside the broad range of reasonably competent performance under prevailing professional standards[,]the postconviction court erred in finding counsel deficient."(Internal quotes omitted). The Florida Supreme Court also found that there was no prejudice.

The Florida Supreme Court's decision on this matter, and indeed the initial decision of the trial court were contrary to, or an unreasonable application of, clearly established law, and based on an unreasonable finding of fact.

**(b)** If you did not exhaust your state remedies on Ground Four, explain why: This Ground was fully exhausted in State postconviction.

**(c) Direct Appeal of Ground Four:**
(1) If you appealed from the judgment of conviction, did you raise this issue? No,
(2) If you did not raise this issue in your direct appeal, explain why: This was properly raised and exhausted in State postconviction.

**(d) Post-Conviction Proceedings:**
(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court? Yes.
(2) If your answer to Question (d)(1) is "Yes," state:
Type of motion or petition: Florida Rule of Criminal Procedure 3.851 Motion to Vacate Judgment and Sentence.
Name and location of the court where the motion or petition was filed: Sixth Judicial Circuit in and for Pinellas County, Florida
Docket or case number (if you know): 08-CF-18029
Date of the court's decision: August 21, 2019
Result (attach a copy of the court's opinion or order, if available): Granted in part, denied in part, vacating of death sentence
(3) Did you receive a hearing on your motion or petition? Yes
(4) Did you appeal from the denial of your motion or petition? The State appealed,

and Mr. Mullens cross-appealed

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? This issue was appealed by the State.

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Florida Supreme Court

Docket or case number (if you know): SC19-1587

Date of the court's decision: August 31, 2022

Result (attach a copy of the court's opinion or order, if available): Reversed in part, affirmed in part, reinstating death sentence

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: The State appealed this issue.

**(e) Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: N/A

<div align="center">

**GROUND FIVE**

**MR. MULLENS'S DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT BECAUSE HE IS INTELLECTUALLY DISABLED. THE STATE COURT DECISIONS ON THIS MATTER WERE CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AND/OR BASED ON AN UNREASONABLE FINDING OF FACT.**

</div>

**(a) Supporting facts:**

The postconviction court erred by denying Mullens's intellectual disability claim. The court assumed that it would have a chance to rule on the intellectual disability claim when Mr. Mullens returned for resentencing following appeal. This did not occur because the Florida Supreme Court reversed the granting of a new penalty phase. If a movant proves he is intellectually disabled at an evidentiary hearing on a Rule 3.851 motion the only remedy is to find him intellectually disabled, vacate the death sentence, and resentence Mr. Mullens. Yet, here, the postconviction court declined to hold that Mr. Mullens is intellectually disabled,

even though it concluded that "Mr. Mullens presented a persuasive case of intellectual disability." Op. 25 (PCR/2945). Instead it "denied" Mr. Mullens's motion. *Ibid.*

The court also erred because its order denying Mr. Mullens's motion is unsupported by competent substantial evidence. The evidence overwhelmingly established that Mr. Mullens is intellectually disabled, as the postconviction court acknowledged. The postconviction court stated that Mr. Mullens had made a "persuasive case of intellectual disability" and that "the State did not put on a case to rebut Mr. Mullens's experts except as to the brain scans." Op. 25 (PCR/2945).

Finally, there were no procedural barriers to the state courts holding that Mr. Mullens is ineligible for the death penalty in light of his intellectual disability. This case raises no issues of retroactivity or forfeiture. Mr. Mullens is entitled to relief under relevant United States Supreme Court precedent because it was decided while Mr. Mullens's case was still open on direct review, meaning the postconviction court should have furnished the rule of decision for an intellectual disability claim in his case. Moreover, no court has ever held that Mr. Mullens is not intellectually disabled. Rather, because of a combination of factors—Mr. Mullens's intellectual disability, the fact that he received ineffective assistance of counsel at his sentencing, and the fact that controlling law at the time of his sentencing hearing precluded an intellectual disability claim—Mr. Mullens's Rule 3.851 motion was his first opportunity to raise an intellectual disability claim.

### A. Mullens presented substantial and unrebutted evidence of intellectual disability.

Mr. Mullens put on overwhelming unrebutted evidence of intellectual disability. The State did not put on any counter evidence. Because there was no evidence supporting the postconviction court's denial of Mr. Mullens's claim of intellectual disability, the decision should be reversed, and the postconviction court should be directed to hold that Mr. Mullens is intellectually disabled and ineligible for the death penalty.

At the evidentiary hearing, Mr. Mullens put on powerful evidence establishing all three of the prongs necessary to prove that he is intellectually disabled. *See* Op. 24–25 (PCR/2944–45). First, Mr. Mullens put on evidence establishing that he has an IQ consistent with a diagnosis of intellectual disability. Op. 10–11 (PCR/2930–31). The *only* valid and reliable IQ test in the record demonstrates that Mr. Mullens has an IQ of 73. Op. 11, 24 (PCR/2931; PCR/2944). And based on that properly administered test, Dr. Ouaou concluded that Mr. Mullens likely has an IQ consistent with intellectual disability. Op. 11, 24 (PCR/2931; PCR/2944). The State put on *no* evidence rebutting Dr. Ouaou's conclusion. Most notably, the State did not put on its own expert, much less produce a properly administered IQ test on which Mr. Mullens had scored higher than 73.

Second, Mr. Mullens put on evidence establishing that he has suffered from adaptive deficits. Deficits in *one* of three domains—conceptual, social, or practical

behavior—are sufficient for a finding of intellectual disability. AAIDD-11 at 43; DSM-5 at 33. Dr. Ouaou reviewed school and institutional records; interviewed childhood friends and family; consulted with Mr. Mullens's primary school teacher, Kathryn Adikes; and completed the Adaptive Behavior Diagnostic Scale (ABDS), a standardized test for adaptive functioning with two people intimately familiar with Khadafy's childhood behavior: his mother, Cassandra Washington, and his uncle, Kenneth Mullens. PCR/2343–44. Mr. Mullens's scores on the ABDS were in the first percentile and demonstrated impairment in *all three* domains. PCR/2345. Before his incarceration, he could not "drive a car, hold down a job, write a check, manage a bank account, or cook a full meal." Op. 10–11 (PCR/2930–31). Dr. Ouaou found that, before he was 18 years old, Mr. Mullens "had problems with speech and communication and he was highly sensitive." Op. 11 (PCR/2931). He also found that, among other adaptive deficits, "Mr. Mullens did not pick up on social cues and had difficulty initiating or participating in group activities"; "difficulty learning vocational skills" and "managing money"; "problems with reading"; and "problems following direction, problems with time management, and ... reading and writing issues." *Ibid.* On the basis of these deficits, Dr. Ouaou concluded that Mr. Mullens's adaptive deficits warranted a diagnosis of intellectual disability. Op. 12, 25 (PCR/2932; PCR/2945). The State put on no rebuttal evidence.

Third, Mr. Mullens put on evidence establishing that he had experienced the onset of these symptoms "during the development[al] period," that is, before he

turned 18. Op. 11, 25 (PCR/2931; PCR/2945). Again, based on wide-ranging discussions with individuals who had known Mr. Mullens as a child, Mr. Mullens's neuropsychology expert, Dr. Ouaou, diagnosed Mr. Mullens as intellectually disabled. Op. 12, 25 (PCR/2932; PCR/2945). The State put on no evidence rebutting this evidence.

Rather than put on evidence rebutting Mullens's evidence, the State chose to stake its case against intellectual disability on poking holes in Mr. Mullens's evidence. Op. 25 (PCR/2945). That strategic decision failed to persuade the factfinder. The postconviction court found that "Mr. Mullens presented a persuasive case of intellectual disability at the evidentiary hearing." Op. 25 (PCR/2945). And the court noted that "the State did not put on a case to rebut Mr. Mullens' experts except as to the brain scans [showing he may have brain damage]." *Ibid.* That should have been the end of the matter. Because Mr. Mullens showed that he is intellectually disabled, the postconviction court should have held that Mr. Mullens is intellectually disabled, not "denied" his motion. *Ibid.* In light of the overwhelming unrebutted evidence Mr. Mullens presented, this Court should reverse and direct the postconviction court to enter a finding that Mr. Mullens is intellectually disabled. Alternatively, the Court should, at the very least, reverse and direct the postconviction court to make "detailed findings of fact and conclusions of law with respect to" this claim, as required by Rule 3.851(f)(5)(F).[1]

---

[1]    Mr. Mullens has easily satisfied Florida's "clear and convincing evidence" standard for proving intellectual disability. *See* Fla. Stat. § 921.137(4). That

## B. There were no legal barriers to this claim

There were no legal barriers to holding that Mr. Mullens is ineligible for the death penalty because of his intellectual disability. This is a paradigm case for a finding of intellectual disability on a post-conviction motion. Moreover, this case raises no retroactivity issues, and no court has ever held that Mr. Mullens is not intellectually disabled.

As an initial matter, this is the paradigm case for a post-conviction evidentiary hearing. Mr. Mullens could not have raised an intellectual disability claim at his May 13, 2013 sentencing hearing because of the ineffective assistance of his counsel in combination with then-controlling law. As the State itself explained in its opening brief before the Florida Supreme Court (at 73–74), Mr. Mullens could not have raised an intellectual disability claim at his sentencing hearing because (1) his ineffective legal counsel procured an erroneously inflated IQ score of 82 on a incorrectly administered IQ test, and as a result (2) Mr. Mullens's measured IQ at sentencing was too high for him to seek relief from the death penalty on the basis of his intellectual disability under the then-controlling precedent.

---

standard, however, violates due process and cruel and the prohibition against cruel and unusual punishment found in the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and corresponding provisions of the Florida Constitution. Should the Court determine that Mullens has proven he is intellectually disabled by *more* than a preponderance of the evidence but *less* than clear and convincing evidence, the Court should hold that § 921.137(4) is unconstitutional, find Mullens to be intellectually disabled, and hold that he cannot be lawfully executed.

Even though Mr. Mullens could not have raised his intellectual disability claim at his sentencing hearing because of *Florida Supreme Court precedent later found unconstitutional*, in fact, a different (and *lower*) evidentiary standard should have applied, as the U.S. Supreme Court later made clear in *Hall*. Because the U.S. Supreme Court decided that case before Mr. Mullens's case became final on direct review on January 9, 2017, the rule of *Hall* should have applied at Mr. Mullens's sentencing, and therefore Mr. Mullens, with effective counsel, in fact had a viable intellectual disability claim in his case. A postconviction evidentiary hearing is *the* necessary and appropriate route for Mr. Mullens to test the intellectual disability claim he should have been able to raise under the law that should have applied at his sentencing hearing. Any other result would condemn Mr. Mullens, an intellectually disabled man with an IQ of 73 to death—in violation of the Eighth Amendment and *Atkins*, *Hall*, and *Moore*.

The fact that the U.S. Supreme Court decided *Hall* during the pendency of Mr. Mullens's case, and the fact that no court has ever passed on the question of whether Mullens is intellectually disabled, distinguishes this case from recent Florida Supreme Court decisions.

None of the Florida Supreme Court's rationales apply to this case. Mr. Mullens's case was still open on direct review when the United States Supreme Court decided *Hall*. Thus, there were no barriers to the Florida courts holding that the postconviction court erred in failing to grant Mr. Mullens's intellectual disability claim in light of the overwhelming unrebutted evidence presented at the

evidentiary hearing.

The Florida Supreme Court did not address the merits of this claim, instead

stating:

> Mullens next argues that the postconviction court erred in denying his
> intellectual-disability claim. The postconviction court denied this
> claim, noting that Mullens would not be prohibited from later filing a
> motion pursuant to rule 3.203 of the Florida Rules of Criminal
> Procedure. We summarily affirm that ruling. We add only that, under
> rule 3.203, Mullens will be required to establish good cause to excuse
> his failure to meet the rule's timing requirement. We express no view
> on whether the record, as it now stands, would support a finding of
> good cause.

The Florida Supreme Court's decision on this matter, and indeed the initial

decision of the trial court were contrary to, or an unreasonable application of,

clearly established law, and based on an unreasonable finding of fact.

**(b)** If you did not exhaust your state remedies on Ground Five, explain why: This
Ground was fully exhausted in State postconviction. Mr. Mullens will seek a full
merits determination in state court.

**(c) Direct Appeal of Ground Five:**
(1) If you appealed from the judgment of conviction, did you raise this issue? No
(2) If you did not raise this issue in your direct appeal, explain why: This claim was
properly raised and exhausted in State postconviction. Mr. Mullens will return to
state court to obtain a merits ruling.

**(d) Post-Conviction Proceedings:**
(1) Did you raise this issue through a post-conviction motion or petition for habeas
corpus in a state trial court? Yes.
(2) If your answer to Question (d)(1) is "Yes," state:
Type of motion or petition: Florida Rule of Criminal Procedure 3.851 Motion to
Vacate Judgment and Sentence.
Name and location of the court where the motion or petition was filed: Sixth
Judicial Circuit in and for Pinellas County, Florida
Docket or case number (if you know): 08-CF-18029
Date of the court's decision: August 21, 2019
Result (attach a copy of the court's opinion or order, if available): Denied

(3) Did you receive a hearing on your motion or petition? Yes

(4) Did you appeal from the denial of your motion or petition?  Yes

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? Yes

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Florida Supreme Court

Docket or case number (if you know): SC19-1587

Date of the court's decision: August 31, 2022

Result (attach a copy of the court's opinion or order, if available): Affirmed. The court took no position on whether Mr. Mullens could show good cause for filing a Motion to Determine Intellectual Disability under Florida Rule of Criminal Procedure 3.203.

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

**(e) Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Five: Mr. Mullens will exhaust this in state court by filing a motion under Florida Rule of Criminal Procedure 3.203.

## GROUND SIX

**MR. MULLENS'S PLEA AND JURY WAIVER WERE NOT COMPETENT, INTELLIGENT AND VOLUNTARY THUS VIOLATING HIS RIGHTS UNDER THE UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION. THE STATE COURT DECISIONS ON THIS MATTER WERE CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AND/OR BASED ON AN UNREASONABLE FINDING OF FACT.**

**(a) Supporting facts:**

Defense counsel advised Mr. Mullens not only to "plead open" to capital murder—*i.e.*, to plead guilty without a negotiated sentence—but also to waive his right to have a jury decide whether to impose a death sentence. Trial counsel advised Mr. Mullens to undertake these waivers (1) in the face of multiple red flags

about Mr. Mullens's capacity to enter a voluntary plea; (2) despite having not investigated critically important mitigating evidence that could have been presented to the jury; (3) based on representations that the trial judge would not impose a death sentence, which turned out to be grievously wrong; and (4) ignoring that waiving a sentencing jury meant forgoing any possibility of relief should the law governing sentencing juries change, as it did just two years later. Advising Mr. Mullens to waive his rights in these circumstances amounted to ineffective assistance of counsel and caused severe prejudice. The postconviction court should have vacated Mr. Mullens's conviction and sentence on this basis.

**A. The Postconviction Court Erred in Finding Mr. Mullens's Waivers Competent, Intelligent, and Voluntary Despite Trial Counsel's Numerous Failures.**

**1**. **Counsel failed to investigate and present important evidence showing that Mr. Mullens was incompetent to voluntarily plead guilty and waive the sentencing jury.**

The postconviction record established that Mr. Mullens was not competent to plead guilty or to waive his right to a sentencing jury, and that trial counsel acted unreasonably by ignoring evidence that Mr. Mullens lacked capacity and by advising him to waive those fundamental rights.

At the outset, undisputed evidence established that Mr. Mullens was under severe emotional distress in the weeks immediately leading up to his plea and waiver of the sentencing jury. Mr. Mullens's sister, Kendra, died of a drug overdose in February 2013, in the midst of Mr. Mullens's discussions with counsel. PCR/1653. Mr. Mullens developed depression so severe that he could hardly speak

without slurring. PCR/2069. He was placed on psychiatric observation and suicide watch one day prior to his signature on a defense memorandum indicating that he would plead guilty without a negotiated sentence. PCR/3277. In light of Mr. Mullens's behavior, all of the professionals on Mr. Mullens's team explained that they had serious concerns about his ability to understand consequences, meaningfully consult with counsel, and make informed decisions. PCR/1656–59; PCR/1730–31; PCR/1740; PCR/1794. And yet counsel forged ahead with advising a guilty plea and jury waiver.

On top of Mr. Mullens's severe emotional distress during plea discussions, undisputed evidence established that in the leadup to his plea, antipsychotic medication was warping Mr. Mullens's state of mind and hindering his decisionmaking. On postconviction review, Dr. Maher reviewed the medical records that trial counsel had neglected to request from the Pinellas County Jail and found that Mr. Mullens had been prescribed perphenazine— "an incredibly powerful mind-altering sedative" used to treat psychosis. PCR/2223–24. Mr. Mullens had been prescribed 16 mg daily, the maximum daily outpatient dose permitted under medical guidelines. PCR/2196. Dr. Maher testified that "[i]f I gave 16 milligrams of that drug to a patient in my office, I would not expect them to have any idea what was going on." PCR/2223. The drug at that dosage prompts the inability "to weigh ... long-term consequences"—patients describe feeling "marshmallowy," "disconnected," "amorphous," and as though "things ... are just kind of pushing along." PCR/2201.

Dr. Maher further testified that, if a patient taking perphenazine had "an abnormal brain, you would have additional side effects diminishing the individual's cognition, understanding of his environment and judgment." PCR/2199. "[W]hen there's an impairment or a malfunction in the frontal lobe and you add a sedative, it is synergistically diminishing in the frontal lobe capacity." PCR/2200.

Compounding Mr. Mullens's severe distress and adulterated mental state, postconviction testing indicated that Mr. Mullens had extremely low levels of verbal comprehension. PCR/2202–04. Dr. Maher testified that for patients like Mr. Mullens who have "very low verbal comprehension from the start," perphenazine "would induce a state of mind where he is inclined to be agreeable, where he is inclined to answer questions from authority figures, particularly in a formal environment, in the affirmative." PCR/2202.

Dr. Maher concluded that—given Mr. Mullens's PTSD, brain damage, emotional stress, and heavy dose of antipsychotic medication—Mr. Mullens was not "capable of making a knowing and voluntary plea" in April 2013. PCR/2203–04. Dr. Maher confirmed that nothing in Mr. Mullens's plea colloquy (or his pre-plea competency hearing) affected that conclusion. "[U]nfortunately," Dr. Maher explained, "the pattern of responding in the affirmative ... about what he understood is not a confirmation of his competency" given Mr. Mullens's "circumstances, his state of mind, his diagnoses, [and] his medication." PCR/2204–05. Correspondence sent after the plea hearing, consistent with Dr.

Maher's testimony, confirmed that Mr. Mullens did not in fact understand the significance of his guilty plea. PCR/3780–84 (State's Exs. 14 & 15).

Trial counsel did not investigate these key facts; therefore, these facts were not presented to the trial court before it found Mr. Mullens competent to proceed. Specifically, trial counsel did not obtain medical, psychological, or disciplinary records from the Pinellas County Jail from after October 2012. Those records would have informed counsel of Mr. Mullens's intense depression, suicidal episode, and heavy medication—all of which a reasonable attorney would have brought to the court's attention and would have likely changed the outcome of the court's competency determination.

In nonetheless finding Mr. Mullens's waivers voluntary, the postconviction court focused on testimony indicating that Mr. Mullens *was better* able to communicate with counsel when on his antipsychotic medication. Op. 6 (PCR/2926). But that fact, even if true, is irrelevant. It does not matter if Mr. Mullens would have been even *less* competent without intense sedative medication; he was still incompetent to plead guilty while on it, which trial counsel should have known. Competency is not a relative question; the question is whether Mr. Mullens was able to understand the proceedings and able to provide an intelligent, voluntary waiver. On that critical question, Dr. Maher's key testimony was unrebutted.

The court, moreover, ignored extensive, unrebutted testimony describing how Mr. Mullens's specific medication rendered him unable to render a voluntary

waiver even though he may have appeared competent to third-party observers. Again, Dr. Maher explained that "the pattern of responding in the affirmative … about what he understood is not a confirmation of his competency" given Mr. Mullens's "circumstances, his state of mind, his diagnoses, [and] his medication." PCR/2204–05. To be sure, the State attempted to poke holes in one aspect of Dr. Maher's testimony: it denied the possibility of interaction between Mr. Mullens's medication and his brain function because it disputed that Mr. Mullens had suffered brain damage at all. PCR/2905-06. The State tried to cast doubt on Mr. Mullens's incompetency, citing other scattered evidence of Mr. Mullens's intellectual engagement. But the State tellingly did not dispute Dr. Maher's core conclusion that, given Mr. Mullens's mental state and medication, he could not meaningfully understand the consequences of a guilty plea or jury waiver, and that outward manifestations of his understanding could not be trusted.

For that same reason, Mr. Mullens's plea colloquy, even if "thorough," Op. 8 (PCR/2928), does not bear on the question of ineffective assistance of counsel presented here. Dr. Maher specifically reviewed that colloquy and explained cogently why it did not change his opinion: assent from a deeply depressed and heavily medicated individual with limited verbal cognition cannot be taken at face value. Trial counsel acted unreasonably by doing so.

### 2. Mr. Mullens could not have intelligently waived his right to a sentencing jury because trial counsel did not investigate key mitigating evidence.

Independent from Mr. Mullens's manifest lack of competency to waive his

constitutional rights, Mr. Mullens could not validly waive his right to a sentencing jury because counsel failed to investigate entire categories of mitigating evidence that could have had a dispositive effect on his sentence if presented to a jury. As the postconviction court concluded, counsel was deficient in failing to investigate and present evidence related to Mr. Mullens's PTSD, FASD, head injuries, neuropsychological testing, intellectual disability, and brain damage. And those failures were manifestly prejudicial; the postconviction court found a reasonable probability that it would not have imposed a death sentence in the face of that mitigating evidence.

These findings should have led the postconviction court to conclude that Mr. Mullens's jury waiver was necessarily involuntary, and that counsel acted unreasonably by advising it. Indeed, while the court pointed to Mr. Mullens's mental state at the time of the plea (discussed above) and the effect of *Hurst* (discussed below) as purportedly undercutting this claim, the court did not attempt to explain how, in light of its findings that counsel had neglected to develop mitigating evidence that the court found reasonably likely to be dispositive, Mr. Mullens's waiver of his right to an advisory jury could have been adequately informed. The court's comment that counsel's plea and waiver strategy was "researched" and "thoughtful," Op. 9 (PCR/2929), simply did not account for the court's own conclusion that counsel had not investigated the very evidence they would have presented to the jury.

### 3. Mr. Mullens could not have intelligently waived his right to a sentencing jury because counsel severely understated the risks of waiver.

Counsel advised Mr. Mullens to "plead open" and to waive the right to a sentencing jury based at least in part on their assessment that the judge "had never given death." PCR/3040. This, too, was unreasonable and rendered Mr. Mullens's waiver of his right to a jury invalid. A guilty plea to a murder charge based on an attorney's mistaken promise that the judge will not impose the death penalty will result in an automatic reversal, even if the motion is made well after the imposition of the sentence. Even where counsel does not make a hard promise, "[d]efense attorneys must be careful when advising their clients to plead guilty." "It is unprofessional conduct for a lawyer intentionally to understate [or] overstate the risks, hazards or prospects of the case to exert undue influence on the accused's decision as to his plea." That is exactly what trial counsel did here.

### 4. Mr. Mullens could not have intelligently waived his right to a sentencing jury because *Hurst* upended those consequences.

Finally, Mr. Mullens could not knowingly waive his right to be sentenced by a jury because he made that waiver before the U.S. Supreme Court's January 2016 decision in *Hurst v. Florida*. Trial counsel would not have advised Mr. Mullens to waive a jury had they known that the Supreme Court in *Hurst* would hold that a jury must unanimously find facts supporting the imposition of a death sentence. PCR/1434–37. Trial counsel believed they could have found at least one juror that would not have voted to impose a death sentence. PCR/1647–48. The intervening

decision in *Hurst* thus rendered Mr. Mullens's plea ineffective, on two bases.

First, the colloquy conducted in this case made it clear that Mr. Mullens was waiving only a jury "recommendation." R15/2252–82. Mr. Mullens did not waive a jury determination of any aggravating circumstance, as *Hurst* expressly requires, and he certainly did not waive a unanimous jury determination that a death sentence should be imposed, as the Eighth Amendment requires.

Second, because counsel specifically preserved a challenge to Florida's capital sentencing procedure as unconstitutional under *Ring v. Arizona*, waiving a sentencing jury was unreasonable because it effectively nullified counsel's own challenge and made relief for Mr. Mullens under *Hurst* unavailable on direct review. In other words, the only way to ensure Mr. Mullens had an effective route to challenge Florida's judge-imposed death penalty system in place before *Hurst*—a system trial counsel recognized was unconstitutional under *Ring*—was to advise that Mr. Mullens insist on a jury having a say in his sentencing. By giving up the sentencing jury, counsel gave up the prospect of relief on appeal, even after *Hurst* was decided.

In rejecting Mr. Mullens's argument, the postconviction court misunderstood the significance of *Hurst*. The point is not just that trial counsel were ineffective because they failed to anticipate *Hurst*. Op. 8 (PCR/2928). Rather, it is that because *Hurst* changed the significance of a sentencing jury—converting the jury from purely advisory body to the conclusive factfinder—Mr. Mullens did not understand, and indeed could not have understood, what he was giving up by

forgoing a sentencing jury.

### B. If Mr. Mullens Had Been Competent and Adequately Informed of the Consequences of His Plea and Waiver, He Would Not Have Made Them.

The State below did not dispute that—assuming counsel did act unreasonably—there is a reasonable probability that Mr. Mullens would not have waived his rights absent the ineffective assistance. That is because there can be no such dispute. At minimum, reasonable counsel would have brought to the trial court's attention the significant evidence undercutting Mr. Mullens's competency, which would have foreclosed Mr. Mullens from entering a guilty plea or a jury waiver—or indeed from proceeding to trial—unless and until he became competent to proceed.

In light of the overwhelming unrebutted evidence that Mr. Mullens's plea and jury waiver were not competent, intelligent, and voluntary—and that counsel should have known as much—this Court should reverse the postconviction court's rejection of this claim.

The Florida Supreme Court affirmed the lower court's decision denying relief. The court rejected Mr. Mullens's argument that his guilty plea was the result of ineffective assistance of counsel. And the court rejected Mr. Mullens's three arguments about jury waiver. The Florida Supreme Court's decision on this matter, and indeed the initial decision of the trial court, were contrary to, or an unreasonable application of, clearly established law, and based on an unreasonable finding of fact.

**(b)** If you did not exhaust your state remedies on Ground Six, explain why: This Ground was fully exhausted in State postconviction.

**(c) Direct Appeal of Ground Six:**
(1) If you appealed from the judgment of conviction, did you raise this issue? No,
(2) If you did not raise this issue in your direct appeal, explain why: This was properly raised and exhausted in State postconviction.

**(d) Post-Conviction Proceedings:**
(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court? Yes.
(2) If your answer to Question (d)(1) is "Yes," state:
Type of motion or petition: Florida Rule of Criminal Procedure 3.851 Motion to Vacate Judgment and Sentence.
Name and location of the court where the motion or petition was filed: Sixth Judicial Circuit in and for Pinellas County, Florida
Docket or case number (if you know): 08-CF-18029
Date of the court's decision: August 21, 2019
Result (attach a copy of the court's opinion or order, if available): Denied
(3) Did you receive a hearing on your motion or petition? Yes
(4) Did you appeal from the denial of your motion or petition? Yes
(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? Yes
(6) If your answer to Question (d)(4) is "Yes," state:
Name and location of the court where the appeal was filed: Florida Supreme Court
Docket or case number (if you know): SC19-1587
Date of the court's decision: August 31, 2022
Result (attach a copy of the court's opinion or order, if available): Affirmed
(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: N/A

**(e) Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Six: N/A

## GROUND SEVEN

**MR. MULLENS'S PRETRIAL AND SENTENCING PROCEEDINGS WERE TAINTED BY OVERWHELMING CUMULATIVE ERROR. THE STATE COURTS' DECISIONS DENYING RELIEF WERE CONTRARY TO OR BASED ON AND UNREASONABLE APPLICATION OF FEDERAL LAW AND BASED ON AN UNREASONABLE DETERMINATION OF FACTS.**

**(a) Supporting facts:**

The cumulative effect of counsel's numerous errors at both the guilt and penalty phases deprived Mr. Mullens of his constitutional right to a fundamentally fair proceeding, guaranteed under the Sixth, Eighth, and Fourteenth Amendments and corresponding provisions of the Florida Constitution. In light the cumulative effect of those errors on the trial proceedings, the Court should vacate Mr. Mullens's plea, jury waiver, and conviction, and order the postconviction court to grant Mr. Mullens new guilt and penalty phases.

The Florida Supreme Court denied the cumulative error claim because "Mullens failed to establish deficient performance in any respect, there is no prejudice to consider cumulatively." The Florida Supreme Court's decision on this matter, and indeed the initial decision of the trial court were contrary to, or an unreasonable application of, clearly established law, and based on an unreasonable finding of fact.

**(b)** If you did not exhaust your state remedies on Ground VII, explain why: This Ground was fully exhausted in State postconviction.

**(c) Direct Appeal of Ground:**
(1) If you appealed from the judgment of conviction, did you raise this issue? No

(2) If you did not raise this issue in your direct appeal, explain why: This was properly raised and exhausted in State postconviction.

**(d) Post-Conviction Proceedings:**
(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court? Yes.
(2) If your answer to Question (d)(1) is "Yes," state:
Type of motion or petition: Florida Rule of Criminal Procedure 3.851 Motion to Vacate Judgment and Sentence.
Name and location of the court where the motion or petition was filed: Sixth Judicial Circuit in and for Pinellas County, Florida
Docket or case number (if you know): 08-CF-18029
Date of the court's decision: August 21, 2019
Result (attach a copy of the court's opinion or order, if available): Denied
(3) Did you receive a hearing on your motion or petition? Yes
(4) Did you appeal from the denial of your motion or petition? Yes
(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? Yes
(6) If your answer to Question (d)(4) is "Yes," state:
Name and location of the court where the appeal was filed: Florida Supreme Court
Docket or case number (if you know): SC19-1587
Date of the court's decision: August 31, 2022
Result (attach a copy of the court's opinion or order, if available): Affirmed
(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: N/A

**(e) Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Seven: N/A

13. Please answer these additional questions about the petition you are filing:

    (a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction? Yes.
    (b) Is there any ground in this petition that has not been presented in some state or federal court? If so, ground or grounds have not been presented, and state your reasons for not presenting them: N/A

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition? No.

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging? No.

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:

The Public Defender's Office, Sixth Judicial Circuit, 14250 49th Street North, Clearwater, FL 33762

(b) At arraignment and plea:

All attorneys employed by The Public Defender's Office, Sixth Judicial Circuit. 14250 49th Street North, Clearwater, FL 33762 at the time of representation.

Jill D. Menadier (retired):
140 88th Ave NE
St Petersburg, FL 33702-3202

Michael Dineen Hays:
7430 Sunshine Skyway Ln S Apt 701
St Petersburg, FL 33711-4984

Allison Ferber Miller:
Ripley Whisenhunt, PLLC
8130 66th St N Ste 3
Pinellas Park, FL 33781-2111

Ronald Jon Eide (retired):
2401 E Vina Del Mar Blvd
Saint Pete Beach, FL 33706-2833

Dudley Jewel Clapp III: Deceased

(c) At trial:

All attorneys employed by The Public Defender's Office, Sixth Judicial Circuit. 14250 49th Street North, Clearwater, FL 33762 at the time of representation.

Jill D. Menadier (retired):
140 88th Ave NE
St Petersburg, FL 33702-3202

Michael Dineen Hays:
7430 Sunshine Skyway Ln S Apt 701
St Petersburg, FL 33711-4984

Allison Ferber Miller:
Ripley Whisenhunt, PLLC
8130 66th St N Ste 3
Pinellas Park, FL 33781-2111

(d) At sentencing:

All attorneys employed by The Public Defender's Office, Sixth Judicial Circuit. 14250 49th Street North Clearwater, FL 33762 at the time of representation.

Jill D. Menadier (retired):
140 88th Ave NE
St Petersburg, FL 33702-3202

Michael Dineen Hays:
7430 Sunshine Skyway Ln S Apt 701
St Petersburg, FL 33711-4984

Allison Ferber Miller:
Ripley Whisenhunt, PLLC
8130 66th St N Ste 3
Pinellas Park, FL 33781-2111

(e) On appeal:

Cynthia Jean Dodge
Public Defenders Office
PO Box 9000
Bartow, FL 33831-9000

(f) In any post-conviction proceeding:

All attorneys employed at Capital Collateral Regional Counsel-Middle at time:
CCRC-M
12973 N Telecom Pkwy
Temple Terrace, FL 33637-0907

Julie A. Morley:

Federal Defender, Middle District
400 N Tampa St Ste 2700
Tampa, FL 33602-4726

Margaret S. Russell
Office of the Public Defender
14250 49th St N
Clearwater, FL 33762-2800

Jami Leigh Chalgren
Law Office of the Public Defender
PO Box 9000
Bartow, FL 33831-9000

(g) On appeal from any ruling against you in a post-conviction proceeding:

Stephen K. Wirth (admitted *pro hac vice*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743

John P. Elwood (admitted *pro hac vice*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743

Andrew T. Tutt (admitted *pro hac vice*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743

Samuel F. Callahan (admitted *pro hac vice*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743

Julie A. Morley:
Federal Defender, Middle District
400 N Tampa St Ste 2700
Tampa, FL 33602-4726

James Lawrence Driscoll Jr.

CCRC-M
12973 N Telecom Pkwy
Temple Terrace, FL 33637-0907

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? No. Mr. Mullens is sentenced to life in this case for a non-capital felony.

    (a) If so, give name and location of court that imposed the other sentence you will serve in the future:
    (b) Give the date the other sentence was imposed:
    (c) Give the length of the other sentence:
    (d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future? Yes. Mr. Mullens will be filing a motion under Florida Rule of Criminal Procedure 3.203 to bar his execution. He will also file a motion to stay and abate these habeas proceedings.

18. **TIMELINESS OF PETITION:** If your judgment of conviction became final over one year ago, you must explain the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of -
    (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
    (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was      prevented from filing by such state action;
    (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
    (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Following direct appeal Mr. Mullens filed a timely Petition for Writ of Certiorari to the Supreme Court of Florida. Upon denial of Certiorari, the limitation period on filing a federal petition commenced. On December 18, 2017, amended May 15, 2018, Mr. Mullens properly filed an application for State postconviction relief before the AEDPA limitation period expired, thus tolling the limitation period. The Florida Supreme Court issued the mandate on December 19, 2022, recommencing the remaining AEDPA limitations period. This Petition was filed within the remaining time. Subtracting the time remaining after tolling, Mr. Mullens had 21 days from the mandate to file. Thus, this petition was timely.

## Relief Requested

Petitioner asks that the Court grant the following relief:

1. Grant Mr. Mullens the opportunity to file a memorandum of law applying the applicable law to the grounds raised in this Petition and arguing for an evidentiary hearing as appropriate.
2. Allow Mr. Mullens to exceed the page limits on the memorandum.
3. Following the State's submission of a response and the record from this case, allow Mr. Mullens to reply and exceed the page limits.
4. Grant all appropriate relief Mr. Mullens is entitled to under the United States Constitution.

Respectfully submitted,

/s/ James L. Driscoll Jr.
James L. Driscoll, Jr.
Assistant CCRC
Florida Bar Number 0078840
Email: driscoll@ccmr.state.fl.us

/s/ Lisa M. Fusaro
Lisa M. Fusaro
Assistant CCRC
Florida Bar Number 119074
Email: fusaro@ccmr.state.fl.us

<u>/s/Morgan P. Laurienzo</u>
Morgan P. Laurienzo
Assistant CCRC
Florida Bar Number 1022658
Email: laurienzo@ccmr.state.fl.us

The Law Office of the Capital Collateral
Regional Counsel - Middle Region
12973 North Telecom Parkway
Temple Terrace, Florida 33637-0907
Tel: (813) 558-1600
Fax: (813) 558-1601
support@ccmr.state.fl.us
Attorneys for the Petitioner

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of January, 2023, the foregoing PETITION UNDER 28 U.S.C. §2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY has been electronically filed with the Clerk of the Court by using the CM/ECF system.

I hereby further certify that a true copy of the foregoing has been emailed to Marilyn M. Beccue, Senior Assistant Attorney General, Office of the Attorney General, 3507 East Frontage Road, Suite 200, Tampa, Florida 33607-7013, at marilyn.beccue@myfloridalegal.com and capapp@myfloridalegal.com on this 6th day of January, 2023.

I hereby further certify that a true copy of the foregoing was mailed to Khadafy Kareem Mullens, DOC# R17884, Union Correctional Institution, P.O. Box 1000, Raiford, FL 32083, a non-CM/ECF participant, on this 6th day of January, 2023.

<div style="margin-left: 40%;">

/s/ James L. Driscoll, Jr.
James L. Driscoll, Jr.
Assistant CCRC
Florida Bar Number 0078840
Email: driscoll@ccmr.state.fl.us

The Law Office of the Capital Collateral
Regional Counsel - Middle Region
12973 North Telecom Parkway
Temple Terrace, Florida 33637-0907
Tel: (813) 558-1600
Fax: (813) 558-1601
support@ccmr.state.fl.us

</div>

**<u>Verification</u>**

I James L. Driscoll, Jr.* as a person authorized to sign this Petition, hereby declare under penalty of perjury that the forgoing is true and correct.

Date: January 6, 2023

<u>/s/ James L. Driscoll, Jr.</u>
James L. Driscoll, Jr.
Assistant CCRC
Florida Bar Number 0078840
Email: driscoll@ccmr.state.fl.us

The Law Office of the Capital Collateral
Regional Counsel - Middle Region
12973 North Telecom Parkway
Temple Terrace, Florida 33637-0907
Tel: (813) 558-1600
Fax: (813) 558-1601
support@ccmr.state.fl.us

* As Attorney of Record I am authorized to sign this Petition under 28 U.S.C. § 2242.